**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------------X

Phil Felice, Individually and on behalf of CAMA Plan FBO
Phil Felice Roth IRA, Dawn Felice, Individually and on behalf
of CAMA Plan FBO Dawn Felice Roth IRA, Michael Carey,
Individually and on behalf of Michael Carey Traditional IRA
(15-01), and Michael Carey Traditional IRA (0504), Steven
Spivack, Linda Spivack , Paul Spivack, Kathleen Spivack,
Frank Held, and Vincent Ruta,

*Plaintiffs,*

v.

Westpark Capital, Inc., Robert Ainbinder, Michael Ainbinder,
and NYIAX, Inc.,

*Defendants.*

:  **Case No.**
:
:
:  **COMPLAINT**
:
:
:  **JURY TRIAL**
:  **DEMANDED**
:

-----------------------------------------------------------------------------X

Plaintiffs Phil Felice, Individually and on Behalf of CAMA Plan FBO Phil Felice

Roth IRA ("Mr. Felice"), Dawn Felice, Individually and on Behalf of CAMA Plan FBO

Dawn Felice Roth IRA ("Mrs. Felice"), Michael Carey, Individually and on Behalf of

Michael Carey Traditional IRA (15-01) and Michael Carey Traditional IRA (0504) ("Mr.

Carey"), Steven Spivack ("Steven Spivack"), Linda Spivack ("Linda Spivack"), Paul

Spivack ("Paul Spivack"), Kathleen Spivack ("Kathleen Spivack"), Frank Held ("Mr.

Held"), and Vincent Ruta ("Mr. Ruta" and collectively, "Plaintiffs"), by and through their

undersigned counsel, Conway & Conway, bring this action for damages and other legal

or equitable relief against Defendants Westpark Capital, Inc., ("Westpark") Robert

Ainbinder ("Robert Ainbinder"), Michael Ainbinder ("Michael Ainbinder"), and

NYIAX, Inc., ("NYIAX" and collectively "Defendants"), for (1) fraud and fraudulent

concealment in relation to Defendants' long-running scheme to fraudulently solicit

Plaintiffs' investments in NYIAX, (2) violations of Section 10b-5 of the Securities

Exchange Act of 1934, and (3) several other causes of action set forth in detail below:

## THE PARTIES

1.  Plaintiff Phil Felice is an individual residing in West Islip, New York.

2.  Plaintiff Dawn Felice is Phil Felice's wife and an individual residing in West Islip, New York.

3.  Plaintiff Michael Carey is an individual residing in Loudon, Tennessee.

4.  Plaintiff Steven Spivack is an individual residing in New York.

5.  Plaintiff Linda Spivack is Steven Spivack's wife and an individual residing in New York.

6.  Plaintiff Paul Spivack is an individual residing in New York

7.  Plaintiff Kathleen Spivack is Paul Spivack's wife and an individual residing in New York

8.  Plaintiff Frank Held is an individual residing in West Babylon, New York.

9.  Plaintiff Vincent Ruta is an individual residing in Matawan, New Jersey.

10. Defendant Westpark Capital, Inc. was at all times registered with the United States Securities and Exchange Commission ("SEC") as a broker/dealer, and is a member of the Financial Industry Regulatory Authority, Inc. ("FINRA"), CRD# 39914. Westpark maintains its corporate offices at 1800 Century Park East, Suite 220, Los Angeles, CA 90067.

11. Defendant Robert Ainbinder was an associated person of FINRA member Westpark Capital, Inc. and registered representative, FINRA CRD# 2389470. Robert Ainbinder is also a member of the Board of Directors of Defendants NYIAX, and for a time was the Chief Executive Officer ("CEO") of NYIAX.

12.   Defendant Michael Ainbinder was an associated person of FINRA member Westpark Capital, Inc. and registered representative, FINRA CRD# 1882557.

13.   Defendant NYIAX, Inc. is a Delaware Corporation that maintains its corporate offices at 180 Maiden Lane, 11th Floor, New York, NY 10005.

## JURISDICTION AND VENUE

14.   Pursuant to 28 U.S.C. § 1331 this Court has jurisdiction over this matter, as Plaintiffs allege violations by Defendants of the laws of the United States, including violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5, thereunder [17 C.F.R. § 240.10b-5], and Section 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)].

15.   Supplemental jurisdiction over the common law and State law claims alleged herein is available under 28 U.S.C. §1367(a) as they arise from the same core of operative facts as those arising under 28 U.S.C. § 1331, and are therefore properly brought before this Court.

16.   Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants, in particular NYIAX, Inc. and Robert Ainbinder, reside, are found, have agents, and transact their affairs as alleged herein within this district, and a substantial part of the events or omissions giving rise to the action occurred within this district.

## JOINDER OF PLAINTIFFS

17.   Pursuant to Rule 20 of the Federal Rules of Civil Procedure, governing permissive joinder of parties, "Persons may join in one action as plaintiffs if: (A)

they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." *Fed. R. Civ. Pro. Rule 20.*

18.    Here, each Plaintiff asserts claims jointly and severally, and arising out of the same series of transactions and occurrences, and questions of law and fact common to all Plaintiffs will arise in this action.

19.    Each Plaintiff was solicited by the same individuals – Robert Ainbinder and Michael Ainbinder, employed by the same broker-dealer – Westpark, to invest in the same private placement – NYIAX. Each Plaintiff did invest in NYIAX, mostly through their respective customer accounts at Westpark, on the basis of the same fraudulent statements made by the Ainbinders, often made to groups of the Plaintiffs at the same time.

## STATEMENT OF FACTS

A.    **Plaintiffs' Factual Backgrounds**

20.    Plaintiffs' respective investments in NYIAX are reflected in the below chart:

| Year | Phil & Dawn Felice | Steven & Linda Spivack | Paul & Kathleen Spivack | Michael Carey & Michael Carey IRA | Frank Held | Vincent Ruta | TOTAL |
|------|------|------|------|------|------|------|------|
| 2016 | $50,000 | $100,000 | $100,000 | $300,000 | $50,000 | $50,000 | |
| 2017 | $50,000 | $100,000 | $100,000 | | $30,000 | $20,000 | |
| 2018 | | $50,000 | $50,000 | | | | |
| 2019 | | | | | | | |
| 2020 | | $50,000 | $50,000 | | | | |
| 2021 | | $25,000 | $25,000 | | | | |
| 2022 | | $13,750 | $13,750 | | | | |
| TOTAL | $100,000 | $338,750 | $338,750 | $300,000 | $80,000 | $70,000 | $1,227,500 |

**Phil Felice and Dawn Felice**

21. Mr. Felice was born on July 31, 1962 and is currently 61 years old.

22. Mr. Felice obtained a Bachelor's Degree from CW Post Univeristy in 1996, and a Juris Doctorate from Touro Law School in 1999.

23. Mr. Felice works as an attorney with his own practice, the Law Offices of Phil W. Felice, PC.

24. Mr. Felice opened his first brokerage account, with conservative risk tolerance, in 1987, and has maintained that account. Prior to his investment in NYIAX he had no experience investing in private securities offerings.

25. Mrs. Felice, Mr. Felice's wife, was born on April 24, 1959, and is currently 64 years old.

26. Mrs. Felice graduated high school in 1977 and then spent about one and a half years studying at Suffolk Community College.

27. Mrs. Felice has been employed as a licensed real estate salesperson since 1988.

**Michael Carey**

28. Mr. Carey was born on February 3, 1963 and is currently 60 years old.

29. Mr. Carey obtained a Bachelor's Degree in computer science and electrical engineering from Stony Brook University in 1985, and a Master's Degree in electrical engineering from Stony Brook University in 1987.

30. Upon the completion of his Master's Degree, Mr. Carey became employed as an engineer with Northrup Grumman in 1986.

31. In 1988, Mr. Carey resigned from Northrup Grumman to open his own business, IT Systems Group, Inc., a technology company. Mr. Carey owned and operated

IT Systems Group, Inc. until he sold the business in 2017. Mr. Carey currently works as a flight instructor.

32. While Mr. Carey has experience trading public securities, he had no experience investing in private placements prior to his investment in NYIAX.

### Steven Spivack and Linda Spivack

33. Steven Spivack was born on April 3, 1952, and is currently 71 years old.

34. Mr. Spivack obtained a Bachelor's Degree in psychology from the University of Denver in 1974.

35. In 1976, Mr. Spivack became employed by S&H Realty, a family property management and building company, of which he eventually became a part owner, and which he continues to own and operate through the present date.

36. Mr. Spivack opened his first brokerage account at UBS Wealth Management in or about the early 1980's.

37. Since that time, Mr. Spivack has maintained brokerage accounts, each of which were managed accounts with conservative risk tolerance, at various institutions. He had no experience investing in private placements prior to his investment in NYIAX.

38. Linda Spivack, Steven Spivack's wife, was born on April 29, 1958 and is currently 65 years old.

39. Mrs. Spivack obtained an Associate's Degree in dental hygiene from New York State University Farmingdale in 1978.

40. Mrs. Spivack was employed as a dental hygienist from 1990 through 2006.

41.  She has no prior investment experience, other than being a joint accountholder with Steven on certain managed brokerage accounts.

### Paul Spivack and Kathleen Spivack

42.  Paul Spivack, Steven Spivack's brother, was born on July 31, 1954 and is currently 69 years old.

43.  Mr. Spivack obtained a Bachelor's Degree from the University of Denver in 1976.

44.  After obtaining his degree, Mr. Spivack owned and operated a bar/restaurant in New York until 1979.

45.  In 1979, Mr. Spivack also joined S&H Realty, the Spivack family property management and building business. Mr. Spivack eventually became an owner of S&H Realty and continues to own and operate the business along with his brother, Steven, through the present date.

46.  Mr. Spivack opened his first brokerage account at UBS Wealth Management in or about the early 1980's.

47.  Since that time, Mr. Spivack has maintained brokerage accounts, each of which were managed accounts with conservative risk tolerance, at various institutions. He had no experience investing in private placements prior to his investment in NYIAX.

48.  Kathleen Spivack, Paul Spivack's wife, was born on October 25, 1964 and is currently 59 years old.

49.  Mrs. Spivack obtained a General Education Degree in 1985 and subsequently obtained an Associates Degree in occupational studies from New York College in 1996.

50.   Mrs. Spivack was employed as a bank teller and customer service representative from 1982 through 1989. In 1989 she began to work as a bookkeeper at a gym, where she met Paul Spivack.

51.   She continued to work as a bookkeeper until 1991, then returned to the banking industry until 1996, at which point she began work as a massage therapist. She continued work as a massage therapist until the birth of her and Paul's second child in 1998, at which point she became a full time homemaker.

52.   Mrs. Spivack has no prior investment experience, other than being a joint accountholder with Paul on certain managed brokerage accounts.

### Frank Held

53.   Mr. Held was born on October 14, 1959 and is currently 64 years old.

54.   Mr. Held graduated high school in 1977 and did not attend college.

55.   After graduating high school, Mr. Held worked for his family's beverage distribution company, All Star Beverage in Yonkers, New York until 1981.

56.   From 1981 until 2014, Mr. Held worked in trucking for various companies.

57.   In 2014, Mr. Held purchased a fifty percent share in All Star Beverage. He continues to own and operate the business through the present date.

58.   Mr. Held has little prior investment experience, having maintained just one brokerage account – a managed account with conservative risk tolerance at Fidelity.

### Vincent Ruta

59.   Mr. Ruta, Mr. Held's uncle-in-law, was born on December 8, 1954 and is currently 68 years old.

60.     Mr. Ruta obtained an Associate's Degree from Brooklyn Community College in 1975. He spent additional time there studying graphic arts, but did not obtain an additional degree.

61.     Mr. Ruta began working in the printing business in the late 1970's, working at a printing plant. He continued working in the printing and ad production business for various corporations until about 2011.

62.     Thereafter, Mr. Ruta became an owner of All Star Beverage along with Mr. Held. He continues to own and operate the business through the present date.

63.     Mr. Ruta has limited prior investment experience. He opened a 401k account with a conservative risk profile about twenty years ago and has maintained that account.

64.     The factual background for each Plaintiff is summarized in the chart below:

| Plaintiff | Date of Birth | Educational Background | Employment Background | Investment Experience |
|-----------|---------------|------------------------|-----------------------|-----------------------|
| Phil Felice | 7/31/62 | Bachelor's Degree from CW Post University in 1996. Juris Doctorate from Touro Law School in 1999. | Works as an attorney and owns his own practice, the Law Offices of Phil W. Felice, PC. | Opened his first brokerage account in 1987. No prior experience investing in private securities offerings. |
| Dawn Felice | 4/24/59 | High school graduate in 1977. She spent some time studying at Suffolk Community College | Employed as a licensed real estate salesperson since 1988. | No prior investment experience. |

| Plaintiff | Date of Birth | Educational Background | Employment Background | Investment Experience |
|---|---|---|---|---|
| Michael Carey | 2/3/63 | Bachelor's Degree in computer engineering from Stony Brook University in 1985. Master's Degree in Electrical Engineering from Stony Brook in 1987. | Worked for Northrup Grumman from 1986 until 1988. Left Grumman to open his own business, IT Systems Group, Inc., which he owned and operated until his sale of the business in 2017. Now works as a flight instructor. | Opened his first brokerage account at Schwab in his early 20's and has significant experience with self-directed trading. No prior experience with private placements. |
| Steven Spivack | 4/3/52 | Bachelor's Degree in Psychology from University of Denver in 1974. | Joined S&H Realty, a family property management and building company, in 1976 and has continued his employment and ownership of S&H Realty through today. | Opened his first brokerage account in the 1980's and has maintained managed accounts with conservative risk tolerance since then. No previous experience with private placements. |
| Linda Spivack | 4/29/58 | Associate's Degree in Dental Hygiene from NYS University at Farmingdale in 1978. | Worked as a dental hygienist from 1990-2006. | No prior investment experience. |

| Plaintiff | Date of Birth | Educational Background | Employment Background | Investment Experience |
|---|---|---|---|---|
| Paul Spivack | 7/31/54 | Bachelor's Degree from the University of Denver in 1976. | Owned and operated a bar/restaurant from 1976-1979. Joined S&H Realty, a family property management and building company, in 1979 and has continued his employment and ownership of S&H Realty through today. | Opened his first brokerage account in the 1980's and has maintained managed accounts with conservative risk tolerance since then. No prior experience with private placements. |
| Kathleen Spivack | 10/25/64 | Associate's Degree in Occupational Studies from New York College in 1996 | Employed as a bank teller and customer service representative from 1982-1989. Employed as a bookkeeper at a gym from 1989-1991, and then returned to the banking industry until 1996. Employed as a massage therapist from 1996-1998. | No prior investment experience. |
| Frank Held | 10/14/59 | High school graduate (1977) | After high school he worked for his family's beverage distribution business from 1977-1981. Worked in trucking for various companies from 1981-2014. In 2014 he purchased half of his family's beverage distribution business, All Star Beverage, which he continues to own and operate today. | He has maintained a managed account with conservative risk tolerance at Fidelity. No other investment experience. |

| Plaintiff | Date of Birth | Educational Background | Employment Background | Investment Experience |
|---|---|---|---|---|
| Vincent Ruta | 12/8/54 | Associate's Degree from Brooklyn Community College in 1975. He spent some additional time studying graphic arts at Brooklyn Community College | Began work in the printing business in the late 1970's and continued to work in the printing/ad production department of various corporations until 2008. From 2008 through 2011, he worked as an electrical contractor and project manager. In 2011, he bought the other half of All Star Beverage and continues to own and operate the business through today. | Has maintained a 401k account with conservative risk tolerance with Citigroup for about 20 years. No other investment experience, with private placements or otherwise. |

**B.  Defendants' Factual Background and Interrelatedness**

65.  Westpark is a broker-dealer registered with the SEC and a FINRA member firm.

66.  Westpark has been a party to not less than thirteen (13) regulatory and disciplinary actions, including actions by FINRA, the SEC, and various state securities regulators, and two (2) customer complaints that resulted in substantial arbitration awards to the respective customer-plaintiffs.

67.  Additionally, Westpark is subject to FINRA Rule 3170, also known as the "FINRA Taping Rule." The FINRA Taping Rule requires certain FINRA member firms with a history of fraudulent and/or improper practices to record all telephone conversations between their associated persons and existing and potential customers, review those recordings regularly, and file reports with FINRA.

68.  Robert Ainbinder has been a registered representative with FINRA since 1993.

69. From 2015 through 2019, and 2022 through January 2023, Mr. Ainbinder was registered with Westpark.

70. Even during the periods in which Mr. Ainbinder was not registered with Westpark, he continued to act as an investment adviser to Plaintiffs, soliciting them to invest in NYIAX and other securities.

71. During the period of time relevant to this dispute, Mr. Ainbinder also was and continues to be a member of the Board of Directors of NYIAX.

72. From August 2019 to May 2022, Mr. Ainbinder was also the CEO of NYIAX. Mr. Ainbinder further owns approximately 5% of the outstanding shares in NYIAX.

73. Robert Ainbinder has been a defendant in four (4) customer complaints and FINRA arbitrations, each of which resulted in damages paid to the customer-plaintiff.

74. Michael Ainbinder, Robert's brother, was also a FINRA registered representative from 1989 through 1994, and then again from 2015 through 2021.

75. Michael Ainbinder was registered with Westpark from 2015 through 2018.

76. Michael Ainbinder has been a defendant in one (1) customer complaint and FINRA arbitration, which resulted in damages paid to the customer-plaintiff.

77. In or about 2016, NYIAX engaged Westpark to act as the underwriter for a private placement offering of NYIAX common stock. NYIAX subsequently engaged Westpark as underwriter for several additional private offerings.

78. As a result of the engagement, Westpark agreed to solicit investors on a "best efforts" basis to invest in NYIAX, in exchange for a commission of ten percent

(10%) of the gross proceeds of the offering and additional compensation in shares equal to three percent (3%) of NYIAX's then-outstanding common stock. This arrangement was repeated for the subsequent offerings, with the addition of an expense allowance for Westpark. These expenses were never properly or adequately disclosed to the Plaintiffs.

**C.    Plaintiffs' Introduction to NYIAX**

79.    Most of the Plaintiffs knew Robert and/or Michael Ainbinder, who are brothers, prior to learning of NYIAX.

80.    Mr. Carey was a high school classmate of Michael Ainbinder.

81.    In the early 1990's Mr. Carey and Mr. Held formed a musical band with Robert Ainbinder. The band played several engagements throughout the 1990's.

82.    In or about the late 1990's the band dissolved and the Plaintiff band members fell out of touch with the Ainbinders.

83.    In or about early 2016, Robert Ainbinder reached out to Mr. Carey and Mr. Held via telephone to inform them of an opportunity to invest in NYIAX.

84.    Mr. Held then contacted Mr. Felice and advised Mr. Felice of his conversation with Robert Ainbinder.

85.    Subsequent to Robert Ainbinder's calls to Mr. Carey, and Mr. Held, Michael Ainbinder proposed that the group, and Mr. Felice, get together to play music.

86.    The true purpose of Michael's proposal to get together was to continue the Ainbinders' solicitation of the investment opportunity in NYIAX to Mr. Carey, Mr. Felice, and Mr. Held.

87. At the time, the Ainbinders had both become registered representatives with FINRA, and were employed by Westpark.

88. In or about March of 2016, Mr. Carey, Mr. Felice, Mr. Held, and the Ainbinders got together at Mr. Carey's house to play music.

89. During this meeting, the Ainbinders pitched the NYIAX investment, as will be described below, to Mr. Carey, Mr. Felice, and Mr. Held.

90. The Spivack families first met Michael Ainbinder in or about 2011, when Paul Spivack hired Mr. Ainbinder as a guitar teacher for his son.

91. In or about early 2016, Michael made his initial solicitation to Paul Spivack to invest in NYIAX, and subsequently introduced Steven and Paul to Robert Ainbinder.

**D.  Facts Common to All Plaintiffs**

92. In soliciting the NYIAX investment to Plaintiffs, Robert Ainbinder and Michael Ainbinder explained that NYIAX would offer a marketplace for trading advertising contracts. They stated that NYIAX would "commoditize the ad space." Essentially, NYIAX would act as an exchange for advertising futures contracts.

93. The Ainbinders never disclosed to Plaintiffs that such an exchange would eventually be subjected to onerous regulation by the Commodity Futures Trading Commission ("CFTC") or the SEC. In fact, Michael Ainbinder represented to Plaintiffs that NYIAX would be operating "in the wild west" as there would be no regulation or oversight of the business.

94.    The Ainbinders stated to Plaintiffs that NYIAX would generate a profit by charging a fee of ten percent (10%) on every transaction that occurred on the NYIAX platform.[1]

95.    The Ainbinders indicated that the investment would carry very little risk, even telling the potential investors that the only thing that could stop them from generating a significant profit on NYIAX if they invested was a "nuclear holocaust."

96.    They further represented to Plaintiffs, that an investment in NYIAX would generate returns as high as "forty, fifty, or sixty times" the amount they invested and that they would "buy an island" after NYIAX's IPO.

97.    They represented that NYIAX was "three years ahead" of its potential competitors and that the company would initiate an IPO within eighteen months.

98.    In reality, as is the case for any pre-IPO investment, an investment in NYIAX was highly speculative, and bore the risk that the investors would lose all of their principal.

99.    While the Private Placement Memorandum ("PPM") provided to Plaintiffs did disclose that Westpark would receive a commission of ten percent (10%) of the gross proceeds of the offering and additional compensation equal to three percent (3%) of NYIAX's outstanding common stock, the Ainbinders did not explain to Plaintiffs, each of whom had never participated in a private placement offering, that this commission was exceptionally high in comparison to industry standards.[2]

---

[1] Plaintiffs would later learn that NYIAX charged just a four percent (4%) transaction fee.
[2] A 2018 SEC white paper analyzing all Regulation D offerings from 2009 through 2017 found that the average total fee paid to a financial intermediary, such as Westpark, for underwriting such an offering was 2.1% for financial fund issuers, and 5.5% for non-financial fund issuers. *See Exhibit 1, Capital Raising in*

100. In fact the Ainbinders did not mention the commission their employer would receive at all in their discussions with Plaintiffs, nor did they explain the significance of the commission to Plaintiffs in that the value of Plaintiffs' respective investments would immediately be reduced by thirteen percent (13%) as a result of the commission.

101. The Ainbinders also greatly exaggerated the nature of NYIAX's relationship with the National Association of Securities Dealers Automated Quotations ("NASDAQ"), stating that the two entities had obtained a joint patent for certain technology when such patent had not yet been approved, indicating that NASDAQ had shared certain proprietary technology with NYIAX, and giving certain of the Plaintiffs the impression that NASDAQ was a partner and shareholder in NYIAX.

102. In Plaintiffs' eyes, NASDAQ's supposed strong interest in NYIAX's success was a major selling point for the investment, and lent NYIAX significant credibility.

103. At no point did the Ainbinders disclose their respective histories of customer complaints nor Westpark's history of customer complaints and disciplinary actions to the Plaintiffs.

104. In reliance on the representations made by the Ainbinders, each of the Plaintiffs decided to invest in NYIAX.

105. On or about June 23, 2016, Mr. Felice, together with his wife Mrs. Felice, executed a subscription agreement to purchase shares in NYIAX for $50,000.00 through an IRA.

---

the U.S.: An Analysis of the Market for Unregistered Securities Offerings, 2009-2017, Pages 36-37, available at: https://www.sec.gov/files/dera-white-paper_regulation-d_082018.pdf

106.  On or about June 24, 2016, Mr. Carey executed a subscription agreement to purchase shares in NYIAX for $100,000.00 in an individual account and additional shares for an additional $100,000.00 in his Traditional IRA (15-01).

107.  On or about May 31, 2016, Steven Spivack and Paul Spivack, together with their wives Kathleen Spivack and Linda Spivack, each executed subscription agreements to purchase shares in NYIAX for $100,000.00 (the Spivacks collectively invested $200,000.00 total on May 31, 2016).

108.  On or about June 25, 2016, Mr. Held executed a subscription agreement to purchase shares in NYIAX for $50,000.00 and Mr. Ruta executed a subscription agreement to purchase shares in NYIAX for $50,000.00.

109.  After Plaintiffs made their initial investments, Robert Ainbinder and Michael Ainbinder continued to solicit additional investments from Plaintiffs, and continued to provide misleading and incomplete information to Plaintiffs.

110.  On or about January 24, 2017, Mr. Ainbinder provided a second PPM to Plaintiffs and again solicited them to invest additional funds into NYIAX.

111.  Pursuant to the January 24, 2017 PPM Westpark would again receive a commission of ten percent (10%) of the gross proceeds of the offering, an expense allowance, and an additional three percent (3%) of NYIAX's common stock.

112.  Additionally, on or about January 24, 2017, Michael Ainbinder, while soliciting Mr. Carey to invest additional funds into NYIAX, recommended to Mr. Carey that Mr. Carey mortgage his house in order to obtain more investment funds.[3]

---

[3] Such a recommendation was inappropriate pursuant to FINRA's guidance, which states that "a recommendation for a homeowner to liquefy home equity for investments poses significant and unique risks for investors." *See Exhibit 2, NASD Notice to Members 04-89.*

113.    On or about January 31, 2017, Mr. Ainbinder provided a financial "5 year forecast" for NYIAX to Plaintiffs. The forecast projected that NYIAX would become profitable as soon as 2017, and that by 2021, NYIAX would be generating well over a billion dollars in revenue resulting in profits of $156,330,057.00.

114.    Once again, in reliance on the information provided to them by the Ainbinders, each of the Plaintiffs decided to invest additional funds in NYIAX.

115.    In or about April of 2017, Mr. Felice and Mrs. Felice invested an additional $50,000.00 in NYIAX, $25,000.00 through Mrs. Felice's IRA and $25,000.00 through Mr. Felice's IRA.

116.    On or about August 10, 2016, Mr. Carey invested an additional $50,000.00 in NYIAX through his Traditional IRA (15-01) and another additional $50,000 through his Traditional IRA (0504).

117.    On or about February 7, 2017, Steven Spivack and Linda Spivack, and Paul Spivack and Kathleen Spivack each invested an additional $100,000.00 in NYIAX, pursuant to the terms of another private placement offering, dated January 24, 2017 (the Spivacks collectively invested an additional $200,000.00 in total).

118.    On or about March 22, 2017, Mr. Held invested an additional $30,000.00 in NYIAX and Mr. Ruta invested an additional $20,000.00.

119.    By the end of 2017, eighteen months had passed from Plaintiffs' initial investment and NYIAX did not appear to be close to launching an IPO.

120. However, Robert Ainbinder continued to solicit funds from Plaintiffs and continued to make similar misrepresentations about NYIAX.

121. Mr. Ainbinder's repeated solicitations led Steven Spivack and Linda Spivack, and Paul Spivack and Kathleen Spivack to invest an additional $50,000.00 each on or about January 19, 2018 (the Spivacks collectively invested an additional $100,000.00 in total on January 19, 2018), and then to each make a series of convertible loans to NYIAX on April 20, 2020, August 30, 2021, and February 2, 2022 for a total of an additional $88,750.00 each (the Spivacks collectively invested an additional $177,500.00 in total via convertible loans).

122. Each of the Plaintiffs repeatedly requested information from NYIAX and Mr. Ainbinder in regard to NYIAX's financials, the timeline for the promised IPO, and Plaintiffs' investments.

123. Plaintiffs were never provided with statements reflecting the performance of their investments, and Mr. Ainbinder refused to provide Plaintiffs any financial information beyond vague representations that NYIAX was doing well, trending in the right direction, and generating significant revenues.

124. In fact, Mr. Ainbinder repeatedly advised Plaintiffs that NYIAX could not disclose financial information to the investors, such as NYIAX's revenue, due to SEC regulations. This was an untrue statement.

125. Additionally, Mr. Ainbinder repeatedly promised that the IPO was approaching, telling Plaintiffs that it would occur and make them rich around the time of upcoming holidays repeatedly.

**E.    Mr. Felice's Communications with Mr. Ainbinder on behalf of Plaintiffs**

126.  In or about 2019, Mr. Felice began to primarily communicate with Mr. Ainbinder and others at NYIAX on behalf of Plaintiffs.

127.  Mr. Ainbinder continued to provide misrepresentations and outright lies regarding NYIAX to Mr. Felice.

128.  For example, in a series of text messages on March 23, 2020, Robert Ainbinder, who at the time was the CEO of NYIAX, stated to Mr. Felice "I have cut salaries across the board Carolina and Mark have been cut to $35k a year[,]" while trying to solicit more funds from Plaintiffs – following up these texts with "I now need money from you and everyone else[.] If everyone can kick in $10 to $20,000 each we survive this[.]" *See Exhibit 3, Text Messages.*

129.  However, the first Form S-1 Registration Statement filed with the SEC by NYIAX on June 1, 2022 revealed that Carolina Abenante's salary in 2020 was $163,840.00 and Mark Grinbaum's salary was $109,550.00. Mr. Ainbinder himself additionally took in a salary of $328,090.00 in 2020.

130.  Furthermore, contrary to the rosy picture painted by Mr. Ainbinder to Plaintiffs, the June 1, 2022 Form S-1 revealed that NYIAX was losing millions of dollars every year, and rather than trending in the right direction, NYIAX had lost over ten million dollars ($10,000,000.00) in 2021 which was almost double its 2020 losses.

131.  Mr. Ainbinder additionally continued to lie to Mr. Felice about NYIAX's perpetually approaching IPO. On August 5, 2020, he stated to Mr. Felice via text message "We have a banker and we are going public[.] Now is the time." He

additionally told Mr. Felice "Phil don't say anything to anyone about us going public other than your people OK[.] To anyone at the company[.] No one knows where I am yet[.]"

132.   On February 24, 2021, Mr. Ainbinder again implied to Mr. Felice that NYIAX would soon go public, stating via text message that "I got us on the cusp of a major breakout in revs and a liquidity event."

133.   As of the present date, NYIAX has not initiated an IPO.

134.   At this point, Mr. Felice had also been inquiring to Mr. Ainbinder about an overdue quarterly report that was promised to the Plaintiffs by NYIAX.

135.   Mr. Ainbinder grew angry with Mr. Felice, and on February 26, 2021 stated "say and I will buy you out now[.]" to which Mr. Felice responded "I accept your offer of the buyout." *See Exhibit 3, Text Messages.*

136.   However, a few days later, Mr. Ainbinder demanded that Mr. Felice agree that he is "selling your stock to me no matter what[,]" and informed him that he would not provide him with the contract to repurchase the shares until after Mr. Felice had agreed.

137.   Mr. Felice obviously refused to agree before seeing the agreement that Mr. Ainbinder wanted him to sign, and Mr. Ainbinder eventually reneged on his offer to repurchase the shares.

**F.     Robert Ainbinder's Recent Communications to Plaintiffs**

138.   Robert Ainbinder continues to mislead the Plaintiffs as to his history of incurring customer complaints and as to a potential NYIAX IPO through the present date.

139. On January 31, 2023, Robert Ainbinder contacted Plaintiffs Steven Spivack and Frank Held and informed them that NYIAX would initiate its IPO on February 6, 2023.

140. Mr. Ainbinder additionally solicited Plaintiffs Steven Spivack and Frank Held to open customer accounts at Westpark, and sent those Plaintiffs various pre-filled new account forms.

141. Included in these forms is a pre-filled "Regulation Best Interest Discussion Documentation[,]" which includes a section entitled "Notes/topics discussed during the meeting regarding the differences between brokerage and advisory services." *See Exhibit 4, Regulation BI Form.*

142. Despite again failing to disclose his extensive history of incurring customer complaints, Mr. Ainbinder checked the box indicating that he had discussed his legal and disciplinary history with the Plaintiffs.

143. Mr. Ainbinder additionally indicated to Mr. Spivack and Mr. Held that the reason that they should open customer accounts at Westpark was that Westpark would be able to obtain more NYIAX shares for its clients in the supposed upcoming IPO than other brokerage firms. Mr. Ainbinder represented to Mr. Spivack that "his guy at Westpark" would "allocate shares to his people" even though the IPO would be oversubscribed.

144. February 6, 2023 has now passed without NYIAX launching an IPO.

**G.     Damages**

145. As a result of Defendants' misconduct:

a.    Mr. Felice and Mrs. Felice have been damaged in an amount not less than one hundred thousand dollars ($100,000.00);

b.    Steven Spivack and Linda Spivack have been damaged in an amount not less than have been damaged in an amount not less than three hundred thirty eight thousand seven hundred fifty dollars ($338,750.00);

c.    Paul Spivack and Kathleen Spivack have been damaged in an amount not less than three hundred thirty eight thousand seven hundred fifty dollars ($338,750.00);

d.    Mr. Carey has been damaged in an amount not less than three hundred thousand dollars ($300,000.00);

e.    Mr. Held has been damaged in an amount not less than eighty thousand dollars ($80,000.00);

f.    and, Mr. Ruta has been damaged in an amount not less than seventy thousand dollars ($70,000.00)

146.   In total, Plaintiffs have incurred losses of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00) as a result of Defendants' fraud.

**COUNTS ALLEGED**

**COUNT ONE:**
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER AS TO ALL DEFENDANTS**

147.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 146 as if fully set forth herein.

148.   Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce or the mails, directly and

indirectly: (a) used and employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including Plaintiffs.

149.  Defendants knowingly or recklessly engaged in the fraudulent conduct described above.

150.  By engaging in the conduct described above, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

151.  As a result of Defendants' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

**COUNT TWO:**
**VIOLATIONS OF SECTION 2016(1) AND 206(2) OF THE ADVISERS ACT AS TO DEFENDANT ROBERT AINBINDER**

152.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 151 as if fully set forth herein.

153.  Defendant, while acting as an investment adviser, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly and indirectly: (a) employed devices, schemes, or artifices to

defraud clients and prospective clients; and (b) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon Plaintiffs.

154. Defendant knowingly or recklessly engaged in the conduct described above.

155. By engaging in the conduct described above, Defendant has violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

156. As a result of Defendant's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

## COUNT THREE:
## FRAUD AS TO ALL DEFENDANTS

157. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 156 as if fully set forth herein.

158. The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.[4]

159. "Where a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."[5]

160. Defendants knowingly made material misrepresentations of fact to Plaintiffs when they represented to Plaintiffs that an investment in NYIAX was virtually risk-free,

---

[4] Eurycleia Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979, 883 N.Y.S.2d 147, 150, 12 N.Y.3d 553, 559 [NY, 2009].
[5] N.Y. CPLR § 3016 (McKinney 2018) ("Particularity in specific actions").

that the timeframe for the NYIAX investment would be at most eighteen months, and that NYIAX had cut executive salaries, in addition to several other willful misstatements of facts detailed above.

161.   Defendants intended to cause Plaintiffs to invest their money in NYIAX in reliance on these misrepresentations.

162.   Plaintiffs did in fact invest money in NYIAX in reliance on Defendants' misrepresentations.

163.   As a result of Defendants' fraud, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

**COUNT FOUR:**
**MISREPRESENTATION AND OMISSION AS TO ALL DEFENDANTS**

164.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 163 as if fully set forth herein.

165.   A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."[6]

166.   Defendants, who solicited Plaintiffs to invest in NYIAX, had a special duty to provide accurate information about NYIAX to Plaintiffs.

167.   Defendants gave incorrect information to Plaintiffs when Defendants represented to Plaintiffs that an investment in NYIAX was virtually risk-free, that the

---

[6] J.A.O. Acquisition Corp. v. Stavitsky, 863 N.E.2d 585, 587, 831 N.Y.S.2d 364, 366, 8 N.Y.3d 144, 148 [NY 2007].

timeframe for the NYIAX investment would be at most eighteen months, and that NYIAX had cut executive salaries, in addition to several other willful misstatements of facts detailed above.

168.   Defendants additionally omitted material information about NYIAX when soliciting Plaintiffs' investments, in that Defendants failed to adequately and properly disclose the commission and fees that Westpark would receive as a result of their investments, the regulatory and customer complaint histories of Westpark and the Ainbinders, and other material information as set forth in detail above.

169.   Plaintiffs reasonably relied on the information provided to them by Defendants in making their decision to invest in NYIAX.

170.   As a result of Defendants' misrepresentations and omissions, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

## COUNT FIVE:
## BREACH OF FIDUCIARY DUTY AS TO ALL DEFENDANTS

171.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 170 as if fully set forth herein.

172.   In order to establish a breach of fiduciary duty, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."[7]

---

[7] Kurtzman v. Bergstol, 40 A.D.3d 588, 590 (2d Dep't, 2007).

173. A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship."[8]

174. Defendants owe an affirmative duty of care and loyalty to their customers. That duty is heightened when the customers are unsophisticated or the broker has discretionary authority.

175. Defendants knew or should have known that Plaintiffs, who lacked any experience investing in private securities offerings, placed their complete trust and confidence in Defendants to provide accurate information about NYIAX.

176. Defendants breached their fiduciary duty to Plaintiffs under applicable state and federal securities laws and exchange rules in a reckless, willful, and wanton manner and with total disregard for the legal and fiduciary rights of Plaintiffs, by making numerous misrepresentations and omissions of material fact to Plaintiffs to induce them to invest in NYIAX.

177. As a result of Defendants' breach of fiduciary duty, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

## COUNT SIX:
## BREACH OF CONTRACT AS TO ALL DEFENDANTS

178. Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 177 as if fully set forth herein.

---

[8] EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 832 N.E.2d 26 [N.Y. 2011] (*citing* Restatement [Second] of Torts § 874, Comment *a.*).

179.  The elements of a breach of contract claim are formation of a contract, performance by one party, failure to perform by another, and resulting damages.[9]

180.  The parties entered into agreements when Plaintiffs executed subscription agreements and shareholder agreements with Defendants under terms whereby Plaintiffs agreed to invest funds in NYIAX in exchange for shares.

181.  Plaintiffs have performed all conditions precedent to bringing this action for breach of contract.

182.  Defendants have each breached their contractual relationship with Plaintiffs in the following manner:

    a.   By negligently performing duties of supervision and due care with respect to the solicitation of Plaintiffs to invest in NYIAX.

    b.   By breaching the fiduciary duty owed to Plaintiff by reason of the contractual relationship and the duties, laws, rules, and regulations thereby incorporated which govern the transactions in Plaintiffs' account.

    c.   By knowingly violating state and federal securities laws.

183.  As a result of Defendants' breach of contract, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

---

[9] New York State Workers' Compensation Bd. v. SGRisk, LLC, 983 N.Y.S.2d 642, 648, 116 A.D.3d 1148, 1153 [NY App. 3rd Dept., 2014].

## COUNT SEVEN:
## BREACH OF THE DUTY OF GOOD FAITH & FAIR DEALING AS TO ALL
## DEFENDANTS

184.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 183 as if fully set forth herein.

185.  "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff."[10]

186.  As a result of their respective contracts with Defendants, Plaintiffs expected to obtain the benefit of being provided accurate information by Defendants in regard to NYIAX.

187.  Defendants withheld a benefit from Plaintiffs in failing to provide accurate information to Plaintiffs as described in detail above.

188.  As a result of Defendants' breach of the duty of good faith and fair dealing, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

## COUNT EIGHT:
## FAILURE TO SUPERVISE AND/OR FAILURE TO IMPLEMENT A
## REASONABLE COMPLIANCE PROGRAM AS TO DEFENDANT
## WESTPARK

189.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 188 as if fully set forth herein.

---

[10] Aventine Inv. Management, Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2d Dep't, 1999).

190.     Defendants violated the Rules of the National Association of Securities Dealers ("NASD"), which have been adopted by FINRA, including Rule 3012, which provides that each member organization shall establish, maintain, and enforce a set of written supervisory control policies that "are reasonably designed to review and supervise the customer account activity conducted by the member's branch office managers, sales managers, or any person performing a similar supervisory function."

191.     A claim of improper supervision is grounded in negligence and is a proper basis for imposing liability upon a brokerage firm.[11] The duty in a claim for improper supervision is the duty of the brokerage firm to exercise a reasonable degree of control and supervision over the activities of its brokers in their handling of customers' accounts.

192.     Westpark had an obligation to adopt and enforce procedures to ensure compliance by its employees, including the Ainbinders, with Westpark's own policies and procedures, federal and state securities law, industry rules, regulations and standards. Westpark had a heightened duty to supervise its registered representatives by virtue of being subjected to FINRA's taping rule as a result of Westpark's history of fraudulent or otherwise improper conduct.

193.     Westpark had a duty to ensure that its employees were not making unsuitable investment recommendations to Plaintiffs or providing false information to Plaintiffs in regard to investment solicitations.

194.     Westpark failed to supervise the Ainbinders in that Westpark failed to detect that the Ainbinders were providing inaccurate information to Plaintiffs in regard to

---

[11] *See* F.D.I.C. v. NASD, Inc., 582 F. Supp. 72, 74 (S.D. Iowa 1984).

NYIAX over the course of several years and failed to conduct any review of the suitability of the NYIAX investment for Plaintiffs.

195.  As a result of Defendants' failure to exercise due diligence in the supervision of its employees, and as a result of Defendants' violations of the rules of FINRA, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

## COUNT NINE:
## NEGLIGENT HIRING AND RETENTION AS TO DEFENDANTS WESTPARK AND NYIAX

196.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 195 as if fully set forth herein.

197.  Under New York law, "A plaintiff states a cause of action for negligent hiring and retention by adequately alleging that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.'"[12]

198.  Defendants knew or should have known of Robert Ainbinder's propensity for the conduct which caused Plaintiffs' damages, based on Robert Ainbinder's FINRA BrokerCheck Report.

199.  In relevant part, the BrokerCheck Report shows that Robert Ainbinder has incurred four (4) prior customer complaints, each of which resulted in a payment made to the customer-plaintiff. The claims involved allegations of misrepresentations, fraud, and unsuitable recommendations in regard to the

---

[12] Krystal G. v. Roman Catholic Diocese of Brooklyn, 933 N.Y.S.2d 515, 521 (N.Y. Sup. Ct., 2011) (quoting Bumpus v. New York City Transit Authority, 47 A.D.3d 653, 654 (2nd Dep't, 2008).

purchase of certain stocks, the same misconduct that caused Plaintiffs damages here.

200.   Prior to his hiring at Westpark and NYIAX, Robert Ainbinder's BrokerCheck Report showed that he was previously employed by four (4) broker-dealers that had each been expelled by FINRA due to violations of FINRA rules and the securities laws.

201.   Despite these glaring red flags, Westpark and NYIAX hired Robert Ainbinder in or around November of 2015 and retained him throughout the time in which Plaintiffs were induced to invest in NYIAX, with no heightened level of supervision.

202.   As a result of Westpark's and NYIAX's negligent hiring and retention of Robert Ainbinder, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of three million six hundred eighty two thousand five hundred dollars ($3,682,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff. Under New York State law, a cause of action of negligent hiring and retention is subject to treble damages.[13]

## COUNT TEN:
## UNSUITABILITY AS TO ALL DEFENDANTS

203.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 202 as if fully set forth herein.

204.   Defendants violated the Rules of FINRA, including FINRA Conduct Rule 2111.

---

[13] Karoon v New York City Transit Authority, 241 A.D.2d 323, 324, 659 N.Y.S.2d 27, 29 (1st Dep't, 1997) ("While a Plaintiff cannot usually recover compensatory damages on the basis of respondeat superior for negligent hiring and retention, "an exception exists to this general principle where the injured plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee.")

205.   FINRA Conduct Rule 2111 provides in relevant part that "when a broker undertakes to give investment advice to a customer (or exercise discretion on behalf of a customer), he assumes an obligation to make only such recommendations as are consistent with the customer's financial situation and needs.

206.   Each of the Plaintiffs did not have prior experience investing in private securities offerings, and most of the Plaintiffs had limited investment experience and had only maintained brokerage accounts with conservative risk tolerance.

207.   However, Defendants recommended that Plaintiffs invest in NYIAX, a high-risk pre-IPO investment, while representing to Plaintiffs that the investment was virtually risk-free.

208.   As a result of Defendants' violations of the rules of FINRA and unsuitable recommendations, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

**COUNT ELEVEN:**
**NEGLIGENCE AS TO ALL DEFENDANTS**

209.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 208 as if fully set forth herein.

210.   A broker/dealer is liable for negligence if it fails to perform the duties of care imposed upon it as a fiduciary entrusted with the funds of a customer, thereby resulting in damages to the customer. Decisions by the Second and the Ninth

Circuit indicate clearly that "evidence of violation of industry standards is admissible as non-conclusive evidence of negligence."[14]

211. Plaintiffs' investments in NYIAX were handled in a negligent manner in light of the purported professional competence of Defendants.

212. Defendants negligently failed to provide accurate information to Plaintiffs in regard to NYIAX and in regard to Defendants' own regulatory and disciplinary histories.

213. As a result of Defendant's negligence, Plaintiffs have been damaged in an amount not yet fully ascertained, but believed to be in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00). See Paragraph 130(a-f) for a breakdown of damages by Plaintiff.

## PUNITIVE DAMAGES, ATTORNEYS' FEES, INTEREST AND COSTS

214. For all of the foregoing reasons, the Court should award compensatory damages in an amount to be determined at trial but not less than one hundred thousand dollars ($100,000.00) to Mr. Felice and Mrs. Felice; not less than three hundred thirty eight thousand seven hundred fifty dollars ($338,750.00) to Steven and Linda Spivack; not less than three hundred thirty eight thousand seven hundred fifty dollars ($338,750.00) to Paul and Kathleen Spivack; not less than three hundred thousand dollars ($300,000.00) to Mr. Carey; not less than eighty thousand dollars ($80,000.00) to Mr. Held; and, not less than seventy thousand ($70,000.00) to Mr. Ruta.

---

[14] *See Mihara v. Dean Witter & Company, Inc.*, 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and NASD rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held."); *see also Dean Witter Reynolds Inc. v. Hammock*, 489 So.2d 761, 767 (1986).

215. The Court should additionally award punitive damages to Plaintiffs.

216. Under New York law, punitive damages are "appropriate in cases involving gross, wanton, or willful fraud or other morally culpable conduct."[15]

217. Defendants, with total disregard for Plaintiffs, induced Plaintiffs to invest over one million dollars ($1,000,000.00) in NYIAX over the course of several years by repeatedly making willful material misrepresentations and omissions of fact to Plaintiffs in regard to NYIAX, in order to benefit themselves in the form of excessive commissions and bonuses.

218. Westpark knowingly or recklessly allowed the Ainbinders to solicit Plaintiffs' investments, without any level of supervision, despite the Ainbinders extensive history of incurring customer complaints and Westpark's own requirement to submit to the FINRA Taping Rule.

219. The Court should additionally award each Plaintiff statutory interest accrued at the rate of nine percent (9%) per annum from the date each respective Plaintiff was fraudulently induced to invest in NYIAX, May 31, 2016, until the date of payment pursuant to CPLR § 5004.[16] Through December 31, 2023, interest will have accrued in the total amount of $838,399.32.

220. The Court should additionally award each Plaintiff his or her respective attorneys' fees and costs pursuant to Paragraph 11.6.5 of each of Plaintiffs' respective Amended and Restated Shareholders' Agreements, which provides that "In any dispute between the parties hereto or their representatives concerning any provision of this Agreement or the right and duties of any Person hereunder, the

---

[15] Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385, 412 (S.D.N.Y. 2005).
[16] "Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." *CPLR § 5004.*

party or parties substantially prevailing in such dispute will be entitled, in addition to such other relief as may be granted, to the attorneys' fees and court costs incurred by reason of such dispute." *See Exhibit 5, Amended and Restated Shareholders' Agreement.*

221.   In total, Plaintiffs request that the Court award compensatory damages in the amount of one million two hundred twenty seven thousand five hundred dollars ($1,227,500), punitive damages in an amount treble compensatory damages for a total of three million six hundred eighty two thousand five hundred dollars ($3,682,500.00), and accrued interest in the amount of eight hundred thirty eight thousand three hundred ninety nine dollars and ninety two cents ($838,399.92), for a total of five million seven hundred forty eight thousand three hundred ninety nine dollars and ninety two cents ($5,748,399.92) in damages, together with such attorneys' fees and costs as the Court deems reasonable.

**WHEREFORE** Plaintiffs requests the following relief:

a.   On the First Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

b.   On the Second Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

c.   On the Third Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

d.   On the Fourth Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

e.   On the Fifth Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

f.   On the Sixth Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

g.   On the Seventh Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

h.   On the Eighth Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven

thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

i.    On the Ninth Count, awarding treble damages in an amount to be determined at trial but not less than three million six hundred eighty two thousand five hundred dollars ($3,682,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

j.    On the Tenth Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

k.    On the Eleventh Count, awarding compensatory damages in an amount to be determined at trial but not less than one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above.

l.    As to all Counts, awarding interest accruing from the date of the breach, which Plaintiffs allege to be no later than the date on which each Plaintiff was fraudulently induced to invest in NYIAX.

m.    As to all Counts, awarding Plaintiffs compensatory damages totaling an amount in excess of one million two hundred twenty seven thousand five hundred dollars ($1,227,500.00), broken down by Plaintiff as reflected in Paragraphs 130(a-f) and 189 above, punitive damages in an amount treble compensatory damages for a total of three million six hundred eighty two thousand five hundred dollars ($3,682,500.00), and accrued interest in the

amount of eight hundred thirty eight thousand three hundred ninety nine dollars and ninety two cents ($838,399.92), for a total of five million seven hundred forty eight thousand three hundred ninety nine dollars and ninety two cents ($5,748,399.92) in damages, plus costs and reasonable attorneys' fees.

n.     As to all Counts, holding Defendants Westpark and NYIAX liable under the doctrine of Respondeat Superior.

o.     As to all Counts, awarding such other and further relief as the Court deems just and equitable.

Dated: New York, New York
      November 17, 2023

Respectfully submitted

CONWAY & CONWAY
Kevin P. Conway (6946)
Attorney for Plaintiff
99 Park Avenue, Room 810
New York, New York 10016
Tel: (212) 938-1080
Fax (212) 938-1207