506(c) offerings since the rule's effectiveness in 2013 (Table 13). Approximately 60% more investors participated in non-fund Rule 506(c) offerings than in fund offerings using general solicitation.  The average number of investors per Rule 506(c) offering (12) is smaller than the average number of investors in a Rule 506(b) offering (15). This could be correlated with smaller amount of capital being raised, on average, in a Rule 506(c) offering, relative to a Rule 506(b) offering. But Rule 506(c) offerings by fund issuers have a similar number of investors, on average, as a Rule 506(b) fund offering. The median numbers are similarly much smaller than average number of investors in both Rule 506(c) and Rule 506(b) offerings.

**Table 13**. Investors in Rule 506(c) market: September 23, 2013 - December 31, 2017

|  | Total number of investors | Mean investors per offering | | Median investors per offering | |
| --- | --- | --- | --- | --- | --- |
|  | All new offerings | All new offerings | New offerings that report investors | All new offerings | New offerings that report investors |
| Rule 506(c) | 82,302 | 12 | 18 | 2 | 7 |
| Funds | 29,681 | 19 | 28 | 4 | 15 |
| Non-Funds | 52,621 | 9 | 16 | 1 | 5 |
| Rule 506(b) | 1,298,470 | 15 | 18 | 4 | 7 |
| Funds | 432,988 | 17 | 25 | 3 | 8 |
| Non-Funds | 865,482 | 14 | 16 | 5 | 6 |

### g. The Role of Financial Intermediaries in the Regulation D market

While financial intermediaries commonly underwrite public offerings, there is relatively little information about intermediary participation in private offerings. One possible role for an intermediary in a private offering is to help issuers locate potential investors without violating the ban on general solicitation, a constraint of the traditional Rule 506 offerings. Using a pre-existing and substantive relationship between the intermediary and potential investors is one method for the issuer to ensure that there was no general solicitation and preserve the Rule 506(b) safe harbor.

Information collected from Form D filings reveals that intermediaries are used relatively infrequently in the Regulation D market. Only about 21% of new offerings by fund issuers during the period 2009-2017 use an intermediary such as a finder or broker-dealer (Table 14),

while for non-fund issuers use an intermediary in approximately 20% of new offerings.[52] The data in Table 11 suggests a time trend in the use of intermediaries. Both fund and non-fund issuers experienced a decrease in the use of intermediaries from 2009 to 2017. For example, the use of intermediaries by non-fund issuers declined from approximately 23% in 2009 to approximately 19% in 2017.

**Table 14.** Use of financial intermediaries and average total fees paid by year, 2009-2017.

|      | Use of Financial Intermediaries | | Average Total Fees paid | |
| --- | --- | --- | --- | --- |
| Year | Fund | Non-Fund | Fund | Non-Fund |
| 2009 | 21.4% | 23.3% | 2.5% | 5.8% |
| 2010 | 22.3% | 22.6% | 2.4% | 5.6% |
| 2011 | 24.3% | 21.1% | 2.0% | 5.5% |
| 2012 | 20.4% | 19.9% | 2.0% | 5.6% |
| 2013 | 22.7% | 19.9% | 2.2% | 5.5% |
| 2014 | 18.8% | 18.6% | 1.6% | 5.5% |
| 2015 | 19.7% | 18.6% | 1.5% | 5.2% |
| 2016 | 19.0% | 18.9% | 2.1% | 5.2% |
| 2017 | 21.1% | 19.3% | 2.4% | 5.5% |
| 2009-2017 | 20.9% | 20.0% | 2.1% | 5.5% |

When an intermediary is used, there is significant variation in the fees between fund and non-fund issuers. We calculate the total fee for an offering as the sum of commission and finder's fees, scaled by the offering amount. Information from Form D filings reveals that the total fee paid by fund issuers is on average approximately 2% during the covered period (Table 14). On the other hand, non-fund issuers pay more than twice that amount: their average fee is approximately 5.5%. Differences in offering and issuer characteristics most likely account for the significant difference.

The use of intermediaries also varies significantly by issuer type (Figure 18). Issuers from the real estate industry are the biggest users of intermediaries (37% of all offerings during 2009-2017) while venture capital funds use intermediaries the least (11% of all offerings during 2009-2017). There is also significant usage of intermediaries by private equity funds and

---

[52] To identify the presence of an intermediary in an offering, we identify those offerings that report paying a commission and/or finder's fee. We also include cases where the CRD number of a recipient of sales compensation is reported on Form D, but no commission and/or finder's fee is paid as of the filing date of the form. Since the issuer could list intermediaries which *will be paid* compensation, we believe that including these cases accounts more accurately for the participation of intermediaries. When calculating the fees paid, however, we only included offerings with positive commission and/or finder's fee.