UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHIL FELICE, *et al.*,

                       Plaintiffs,

             -v-

WESTPARK CAPITAL, INC., *et al.*,

                    Defendants.

23-CV-10138 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

     Plaintiffs, a group of investors, bring this action against a private company in which they

invested, along with the securities brokers who solicited and facilitated their investment,

asserting securities fraud and related claims.  Before the Court are two of the Defendants'

motions to dismiss all counts pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

(ECF Nos. 42, 55.)

     For the reasons that follow, the motions are granted in part and denied in part.

## I.     Background

###     A.    Factual Background

     The following facts are drawn from the Complaint and presumed true for the purposes of

this motion.  *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

     Plaintiffs allege that Robert Ainbinder ("R. Ainbinder") and Michael Ainbinder

("M. Ainbinder"), and by extension the firm with which they were affiliated, WestPark Capital,

Inc. ("WestPark"), fraudulently induced Plaintiffs to purchase and hold shares in the private

company NYIAX, Inc. ("NYIAX").  WestPark is an SEC-registered broker-dealer and a member

of FINRA.  (ECF No. 1 ("Compl.") ¶ 65.)  Beginning in approximately early 2016, NYIAX

hired WestPark as a private placement agent that would "solicit investors on a 'best efforts' basis

to invest in NYIAX, in exchange for a commission of ten percent [] of the gross proceeds of the offering and additional compensation in shares equal to three percent [] of NYIAX's then-outstanding common stock." (*Id.* ¶ 78.)

R. Ainbinder is a FINRA-registered representative who was registered with Westpark from 2015 through 2019, and from 2022 through January 2023. (*Id.* ¶¶ 68-69.) His brother, M. Ainbinder, was a FINRA-registered representative from 1989 through 1994 and from 2015 through 2021 (*id.* ¶ 74), and was registered with WestPark from 2015 through 2018 (*id.* ¶ 75). In addition to having worked for Westpark, R. Ainbinder is a member of the Board of Directors of NYIAX, was its CEO from August 2019 through May 2022, and owns approximately 5% of the outstanding shares in the company. (*Id.* ¶¶ 71-73.)

All of the Plaintiffs except Mr. Ruta and the Felices[1] met one or both of the Ainbinders before learning about NYIAX. (*Id.* ¶ 79.) Mr. Carey[2] and Mr. Held met R. Ainbinder when they formed a musical band together in the 1990s. (*Id.* ¶ 81.) The Spivacks met M. Ainbinder in roughly 2011, when Paul Spivack hired Ainbinder as a guitar teacher for his son. (*Id.* ¶ 90.) M. Ainbinder then introduced the Spivacks to R. Ainbinder. (*Id.* ¶ 91.) Mr. Felice first heard of R. Ainbinder via Mr. Held in 2016. (*Id.* ¶ 84.) Mr. Felice then attended an in-person "get[-]together to play music" with Mr. Held, Mr. Carey and the two Ainbinders at Mr. Carey's house. (*Id.* ¶¶ 84-85, 88.) Three of the above Plaintiffs' wives—Dawn Felice, Linda Spivack, and Kathleen Spivack—are also named Plaintiffs, but are not alleged to have had any direct

---

[1] In general, this opinion uses the plural form of Parties' last names when referring to multiple Parties sharing the same last name.

[2] Mr. Carey was also a high-school classmate of M. Ainbinder. (*Id.* ¶ 80.)

communications with the Ainbinders.  (*See id.* ¶¶ 59-64.)  Mr. Ruta—Mr. Held's uncle-in-law—also is not alleged to have had any direct contact with the Ainbinders.  (*See id.*)

Plaintiffs allege that the Ainbinders began soliciting them to invest in NYIAX in early 2016.  (Compl. ¶ 83.)  The Ainbinders solicited investments from Mr. Carey and Mr. Held over the phone initially, then followed up with Mr. Carey, Mr. Held, and Mr. Felice at the in-person get-together at Mr. Carey's house in approximately March 2016.  (*Id.* ¶¶ 83, 88-89.)  M. Ainbinder initially solicited Paul Spivack and "subsequently introduced Steven and Paul [Spivack] to [R.] Ainbinder."  (*Id.* ¶ 91.)[3]  Based on the lack of any alleged direct contact between the Ainbinders and Dawn Felice, Linda Spivack, Kathleen Spivack, and Mr. Ruta, the Court presumes that these plaintiffs received information about NYIAX secondhand from those plaintiffs who did have direct contact with the Ainbinders.

Plaintiffs allege that the Ainbinders provided them with inaccurate information about NYIAX and failed to disclose their relationship to NYIAX.  The Ainbinders allegedly "never disclosed to Plaintiffs that [NYIAX] would eventually be subjected to onerous regulation" and M. Ainbinder told them that "NYIAX would be operating 'in the wild west' as there would be no regulation or oversight of the business."  (*Id.* ¶ 93.)  The Ainbinders indicated that investing in NYIAX "would carry very little risk" and that there was virtually no chance that Plaintiffs would fail to generate a "significant profit" of as much as "'forty, fifty, or sixty times' the amount they invested."  (*Id.* ¶ 95-96.)  The Ainbinders represented that NYIAX was far ahead of its competitors (*id.* ¶ 97), that it would initiate an IPO within eighteen months of Plaintiffs' initial solicitations (*id.*), and that NYIAX had a close relationship with NASDAQ, including sharing

---

[3] The Court reads this paragraph, as explained by Plaintiffs' opposition brief (Opp. WP at 10), to allege that M. and R. Ainbinder jointly solicited Steven and Paul Spivack in early March 2016, as described in paragraphs 92 through 103 of the Complaint.

"certain proprietary technology" (*id.* ¶ 101).  The Ainbinders also failed to disclose their lengthy history of "customer complaints and disciplinary actions."  (*Id.* ¶ 103.)  According to the Complaint, the Ainbinders continued relaying these misrepresentations to Plaintiffs after the initial 2016 solicitations, inducing them to make further investments throughout 2017 (*id.* ¶¶ 109-19) and some of them to make further investments between 2018 and 2022 (*id.* ¶¶ 120-21).  After Plaintiffs had invested, the Ainbinders refused to share information about NYIAX with them, claiming that they could not do so because of "SEC regulations."  (*Id.* ¶¶ 122-24.) The Ainbinders continued representing that an IPO was imminent, including as recently as January 2023.  (*Id.* ¶¶ 125, 131, 139.)  In approximately 2019, Mr. Felice began communicating with R. Ainbinder "on behalf of Plaintiffs."  (*Id.* ¶ 126.)  R. Ainbinder then misrepresented the state of NYIAX's finances to Mr. Felice, which Mr. Felice discovered when those representations were contradicted by NYIAX's June 1, 2022 SEC filings.  (*Id.* ¶¶ 127-30.)  No Plaintiff other than the Spivacks is alleged to have made any additional investments in NYIAX after 2017.  (*See id.* ¶¶ 92-125.)  The final investments made by the Spivacks were their loans executed on February 2, 2022.  (*Id.* ¶ 121.)

    B.    **Procedural History**

    Plaintiffs initially filed a notice of arbitration with the Financial Industry Regulatory Authority ("FINRA") on March 1, 2023.  (ECF No. 53 ("Opp. WP") at 7.)  Plaintiffs named the Defendants here as respondents in the arbitration, though NYIAX, not a FINRA member, "declined to submit" to arbitration.  (*Id.* n.1.)  The respondents moved to dismiss and the FINRA panel granted their motion in part.  (*Id.* at 7.)  Plaintiffs then withdrew their remaining claims from FINRA and initiated the current action on November 17, 2023.  (Compl.)  WestPark moved to dismiss on February 16, 2024 (ECF No. 42), and R. Ainbinder moved to dismiss on March 22, 2024 (ECF No. 55).  Plaintiffs opposed WestPark's motion on March 15, 2024 (ECF No. 53) and

opposed R. Ainbinder's motion on April 5, 2024 (ECF No. 63).  WestPark replied in support of

its motion on March 25, 2024 (ECF No. 58), and R. Ainbinder replied in support of his motion

on April 12, 2024 (ECF No. 68).  M. Ainbinder and NYIAX answered but did not move to

dismiss the Complaint.  (ECF Nos. 65, 41).

## II.    Legal Standards

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff

must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint

is properly dismissed where "the allegations in a complaint, however true, could not raise a claim

of entitlement to relief." *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct." *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw

"all inferences in the light most favorable to the non-moving party . . . ." *In re NYSE Specialists*

*Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Determining whether a complaint states a plausible

claim is ultimately a "context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### B.    Fraud

Plaintiffs alleging fraud claims must satisfy "heightened pleading requirements" to

withstand a motion to dismiss. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d

Cir. 2007).  Under Federal Rule of Civil Procedure 9(b), a party alleging fraud "must state with

particularity the circumstances constituting" that fraud.  This means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  The particularity requirement of Rule 9(b) applies to claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Plaintiffs alleging securities fraud under federal securities laws must meet the additional requirements of the Private Securities Litigation Reform Act ("PSLRA").  The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).  The Supreme Court has explained that, "[t]o qualify as 'strong' within the intendment of [the PSLRA], . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.   Discussion

### A.   Preclusive Effect of FINRA Arbitration

As an initial matter, the Court addresses Defendants' argument that Plaintiffs' prior attempt to arbitrate their claims has preclusive effects in these proceedings.  According to Defendants, a FINRA arbitration panel dismissed some of Plaintiffs' claims and such claims must now be dismissed on *res judicata* grounds.  (WP Mem. at 27-29.)  Though sometimes

bound up in issues of fact, defenses of *res judicata* and collateral estoppel may be decided on a motion to dismiss. *See, e.g.*, *Cameron v. Church*, 253 F.Supp.2d 611, 617-24 (S.D.N.Y.2003); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998) ("[A] district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes.").

Though not obligated to accept Defendants' representations about the FINRA arbitration as true at this point, the Court assumes without deciding that they are for the purposes of this section of the opinion. The FINRA dismissal order appended to Defendants' briefing dismissed claims on two grounds. First, the FINRA panel dismissed claims against all parties based on the Spivacks' convertible loans made in 2020-2022. (ECF No. 42-8 at 44.) The entirety of the arbitration panel's reasoning was: "[T]he record reveals that the subject securities purchases were made directly through a non-party to this arbitration [(NYIAX)]." (*Id.*) The panel entered the dismissal "pursuant to [FINRA] Rule 12504." (*Id.*) WestPark contends that this was a dismissal "on the merits," but does not explain their position any further. (WP Mem. at 27-28; ECF No. 58 at 12.)

While it is true that FINRA is a court of competent jurisdiction for *res judicata* purposes, *Farber v. Goldman Sachs Grp., Inc.*, No. 10-CV-873, 2011 WL 666396, at *4 (S.D.N.Y. Feb. 16, 2011), there is simply not enough information in the arbitral award provided by Defendants to conclude at this point that it is a final judgment on the merits. At least one other court in this district has confronted a similar situation. There, the court relied heavily on the fact that the arbitral award included an express finding that "[the defendant] was not involved in [the plaintiff's] purchase of the security at issue." *Farber*, 2011 WL 666396, at *4 (cleaned up). "Because [the defendant] could not have committed the securities violations [the plaintiff]

alleged before FINRA without being involved in [the plaintiff's] purchase of the security at issue," the court determined that "this finding, along with the others, demonstrates, clearly, that FINRA was ruling on the merits of Plaintiff's claims, not whether his case was arbitrable." *Id.* While that may ultimately be the case here, the record is insufficient for the Court to draw such a conclusion at this early stage.[4]

The Court therefore declines to dismiss Plaintiffs' claims relating to their 2020-2022 loans at this time. The Court also does not find Plaintiffs' request to vacate the arbitral award persuasive—if they were "dissatisfied with FINRA's order dismissing [their] claims, the proper course would have been for [them] to file a motion to vacate the order pursuant to the Federal Arbitration Act." *Farber*, 2011 WL 666396, at *5 n.2. Finally, the Court notes that the vast majority of Plaintiffs' claims, other than those based on the Spivacks' 2020-2022 loans, would survive dismissal regardless of whether such claims stemming from those loans are barred.

Second, the FINRA order dismissed Plaintiffs' claims against WestPark and against M. Ainbinder brought prior to March 1, 2017, "as the purchases were made prior to the six year period of eligibility and Claimants have not made relevant allegations of continuing fraud by these two respondents." (ECF No. 42-8 at 44.) This has no preclusive effect as to *R. Ainbinder*. As to WestPark, it is a closer call, but the Court ultimately agrees with Plaintiffs at this stage. While New York courts do consider dismissal based on the statute of limitations to be a judgment on the merits with "full *res judicata* effect," *Pharr v. Evergreen Garden, Inc.*, 123 Fed. Appx. 420, 423 (2d Cir.2005) (summary order), it is not clear from the arbitral award that the

---

[4] For example, the order is at least plausibly read as dismissing for failure to join an indispensable party in the arbitration, rather than because the claimants failed to state a claim. Dismissal for lack of joinder or lack of jurisdiction is typically not considered a judgment on the merits for preclusion purposes. *See, e.g.*, *Williams v. United States*, 86 Fed. Cl. 594, 601 (2009).

panel decided based on the statute of limitations.  Plaintiffs plausibly argue that the dismissal was instead based on FINRA's own eligibility rules—a characterization supported by the phrasing of FINRA Rule 12206, on which the panel relied.  The Court therefore declines to dismiss Plaintiffs' claims relating to purchases made before March 1, 2017.

### B.    R. Ainbinder

Against R. Ainbinder, Plaintiffs assert statutory claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), the Advisers Act, 15 U.S.C. § 80b, and FINRA's conduct rules, a variety of common law tort claims, and claims for breach of contract and of the implied duty of good faith and fair dealing.  In his motion to dismiss, R. Ainbinder incorporates a number of arguments advanced in Westpark's motion to dismiss.  The Court addresses all arguments pertaining to R. Ainbinder in this section, regardless of which party raised them in its briefing.

#### 1.    Statutory Claims

##### a.    Exchange Act

Plaintiffs first allege violations of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  At the outset, the Court is mindful of the "longstanding principle enunciated by the Supreme Court that § 10(b) should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, and to protect against fraudulent practices, which constantly vary."  *United States v. Litvak*, 808 F.3d 160, 177 (2d Cir. 2015) (quotation marks omitted).  Nonetheless, Defendants are correct that some of Plaintiffs' claims under Section 10(b) and Rule 10b-5 must be dismissed.

The Exchange Act contains both a statute of limitations and a statute of repose.  The statute of repose, 28 U.S.C. § 1658(b)(2), begins to run "on the date the parties have committed themselves to complete the purchase or sale transaction."  *Seagrape Invs. LLC v. Tuzman*, No.

19-CV-9736, 2020 WL 5751232, at *14 (S.D.N.Y. Sept. 25, 2020) (quoting *Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009)).  "In other words, the statute begins to run on the date of the alleged violation."  *Id.*; *see also Liana Carrier Ltd. v. Pure Biofuels Corp.*, No. 14-CV-3406, 2015 WL 10793422, at *4 (S.D.N.Y. Aug. 14, 2015), *aff'd*, 672 F. App'x 85 (2d Cir. 2016) ("[I]t is clear that under *Arnold*, it is the relevant securities transaction, rather than the wrongful conduct of the defendant, that triggers Section 1658(b)'s statute of repose."); *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) ("Unlike Section 20A, which indicates that a violation can include multiple transactions, a violation of Section 10(b) and Rule 10b-5 occurs at each transaction for the purpose of calculating the repose date. Thus, any claim under Section 10(b) and Rule 10b-5 relating to a sale or purchase of securities that occurred outside the five-year statute of repose is time-barred."); *Langhamer v. Johnson*, No. 22-CV-5404, 2023 WL 6691017, at *10 (S.D.N.Y. Oct. 12, 2023) (same); *Wiedis v. Dreambuilder Invs., LLC*, 268 F. Supp. 3d 457, 465–66 (S.D.N.Y. 2017) (same).[5]  When a plaintiff asserts claims based on a series of violations, the statute of repose applies to each violation separately, and is not susceptible to a "continuing violation theory."  *Abu Dhabi Inv. Auth. v. Mylan N.V.*,

---

[5] Some courts in this Circuit have held that a misrepresentation that occurs *before* the relevant transaction can trigger the statute of repose.  *See, e.g.*, *Arco Cap. Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 544 (S.D.N.Y. 2013) ("[T]his and other courts in this Circuit have held that the repose period runs from the date of last misrepresentation when the last alleged misrepresentation predates the purchase.").  Those cases, however, involved "plaintiffs who, unlike [here], purchased their securities within five years prior to the commencement of their action," and have found "no reason to disturb the long line of cases in this district upholding *Arnold*'s holding."  *Id.*; *see also Fogel v. Wal-Mart de Mexico SAB de CV*, No. 13-CV-2282, 2017 WL 751155, at *8 (S.D.N.Y. Feb. 27, 2017), *aff'd sub nom*. *Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018) (distinguishing *Arnold* "because it addresses a scenario where the alleged misrepresentation was made after the purchase" (quotation marks omitted)); *SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016) (holding that pre-purchase misrepresentations triggered the statute of repose).  Conversely, courts have expressly rejected the same argument that Plaintiffs make here when the relevant misrepresentations came after the corresponding transaction.  *Arco Cap.*, 949 F. Supp. 2d at 544.

No. 20-CV-1342, 2021 WL 516310, at *2-3 (S.D.N.Y. Feb. 10, 2021) (There is no indication in the statutory language that Congress intended the statute of repose to run from the last violation, and this Court declines to read such meaning otherwise absent countervailing authority.").  Nor are misrepresentations that cause one to hold securities that one has already bought, or to forego an opportunity to buy or sell securities, actionable under the statute.  *See Atencio v. Smith Barney, Citigroup, Inc.*, No. 04-CV-5653, 2005 WL 267556, at *4 (S.D.N.Y. Feb. 2, 2005); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754-55 (1975) (a mere offeree of securities has no standing to sue for securities fraud based on a misleading prospectus).  Finally, the statute of repose cannot be equitably tolled, and, unlike the statute of limitations for common-law fraud, is not subject to a discovery rule.  *Mylan*, 2021 WL 516310, at *2; *see also Seagrape*, 2020 WL 5751232 at *14; *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 300 (S.D.N.Y. 2014), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016).

All of Plaintiffs' purchases except the Spivacks' 2020-2022 convertible loans occurred prior to March 1, 2018—five years before Plaintiffs filed their FINRA arbitration—and are therefore untimely.

The Exchange Act's statute of limitations, 28 U.S.C. § 1658(b), bars claims brought more than two years after the discovery of facts constituting a violation of the Act.  Unlike the statute of repose, the statute of limitations is subject to tolling based on the plaintiff's lack of knowledge of the violation.  *In re Bear Stearns*, 995 F. Supp. 2d at 300.

The parties agree that the clock stopped running for statute-of-limitations purposes when Plaintiffs filed their FINRA arbitration on March 1, 2023.  Accordingly, the relevant date after which Plaintiffs' Exchange Act claims must have accrued is March 1, 2021, unless tolled based

on lack of knowledge.  Plaintiffs, however, have plausibly alleged that they were unaware of

earlier violations at least until March 2021.  First, Plaintiffs document extensive efforts by R. and

M. Ainbinder to cover up their alleged misrepresentations, including by offering untruthful

explanations for why the promised IPO never occurred and by withholding detailed information

about NYIAX's performance when it was requested.  (*See, e.g.*, Compl. ¶¶ 115-43; *see also* ECF

No. 63 ("Opp. RA") at 13.)  Second, Plaintiffs credibly allege that "the first time they

definitively learned that [R.] Ainbinder had misled them, and the first time they were able to

sufficiently state a claim for fraud against Defendants, was upon NYIAX's public filing of a

Form S-1 Registration Statement with the SEC on June 1, 2022, which contradicted several of

the representations made by [R.] Ainbinder to Plaintiffs."  (Opp. WP at 11; *see also* Compl.

¶¶ 129-30.)  Third, from text messages provided by Plaintiffs and integral to the Complaint, it is

reasonable to infer that Plaintiffs attempted to investigate whether R. Ainbinder was defrauding

them but were unsuccessful in their efforts, at least until April 2021.  (ECF No. 1-3.)

    In response, R. Ainbinder points to a series of cases holding that prospectuses and written

disclosures suffice to put investors on inquiry notice of conflicting misrepresentations, thereby

triggering the start of the limitations period.  *See, e.g.*, *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d

Cir. 1993); *Levine v. Prudential Bache Props., Inc.*, 855 F.Supp. 924 (N.D. Ill. 1994).  These

cases, however, predate the Supreme Court's decision in *Merck & Co., Inc., v. Reynolds*, which

rejected the "inquiry notice" standard under the Exchange Act.  559 U.S. 633, 650-53 (2010).

Rather than starting at "the point where the facts would lead a reasonably diligent plaintiff to

investigate further," the limitations period starts when "the plaintiff actually knew," or when "a

reasonably diligent plaintiff would have known" about the violation.  *Id.* at 652, 648.  The

Second Circuit has since clarified that a plaintiff has not actually or constructively "discovered"

a fact for statute of limitations purposes until he has enough information to plead it in a complaint and survive a 12(b)(6) motion to dismiss. *See City of Pontiac Gen. Emps.' Ret.t Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) ("Until the plaintiff has uncovered—or a reasonably diligent plaintiff would have uncovered—enough information about the defendant's knowledge or intent to satisfy this pleading standard, he has not 'discovered' the fact of scienter, and the statute of limitations cannot begin to run.").

Here, Plaintiffs have plausibly alleged that they could not have known the full extent of R. Ainbinder's fraudulent conduct, including that it was intentional, until within the limitations period. This is both because the clearest misrepresentations were revealed by the SEC filings in 2022 (Compl. ¶¶ 129-30), and because records of Plaintiffs' communications with R. Ainbinder show a gradual breakdown in trust and an increase in hostilities. In addition, R. Ainbinder allegedly continued lying and misrepresenting the condition of NYIAX to Plaintiffs at least until April 2021. (*See* ECF No. 1-3.) Accordingly, the Spivacks' claims based on their 2020 loans are timely, as are those based on their loans made in 2021 and 2022.

Defendants also argue that Plaintiffs have failed to plead fraud with sufficient particularity. (ECF No. 57 ("RA Mem.") at 14.) A plaintiff pleading a violation of § 10(b) and Rule 10b-5 "must allege that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's conduct caused plaintiff['s] injury." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 321 (2d Cir. 2002) (quotation marks and brackets omitted). "Furthermore, 'causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.*, that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of

the fraudulent statement or omission was the cause of the actual loss suffered.'" *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 372 (S.D.N.Y. 2003) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis omitted).

R. Ainbinder does not dispute that the Spivacks have pleaded loss causation—they invested in NYIAX in 2020-2022, and those investments are allegedly worthless. Rather, he argues that Plaintiffs do not allege a "'strong inference' of scienter," that there is "'affirmative evidence of nonreliance,'" and that they "failed to allege any misrepresentations." (RA Mem. at 22-23 (capitalization altered).) The Court disagrees.

First, "[s]cienter may be established by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Saraf v. Ebix, Inc.*, No. 23-CV-1182, 2024 WL 1298246, at *1 (2d Cir. Mar. 27, 2024) (summary order) (quotation marks omitted). The Court is free to consider R. Ainbinder's misconduct in the period barred by the statutes of limitations and repose. *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) ("As to a timely claim, such a statute does not operate to bar the use of a document that predates the commencement of the limitations period but that is relevant to events during the period.").

Taken together, the facts as alleged support a strong inference of an extensive and ongoing effort to deceive Plaintiffs and coerce them into investing more money in NYIAX. Plaintiffs allege that R. Ainbinder lied to them regarding employee salaries and revenues in order to paint a rosy rather than concerning picture of NYIAX's finances. (Compl. ¶¶ 127-130.) They also allege that R. Ainbinder continually lied about the proximity of an IPO, despite strong circumstantial evidence that no such IPO was ever forthcoming. (*Id.* ¶¶ 131, 132, 139.) While it

is possible that, at any given point in time, R. Ainbinder was simply incorrect that an IPO was imminent, the lengthy pattern of misrepresentations, coupled with coincident aggressive solicitations, leads the Court to conclude that the most probable inference is one of intentional fraud. *Cf. Saraf*, 2024 WL 1298246, at *3 (being wrong or failing to be "more curious or concerned" does not constitute scienter).

Second, the Spivacks adequately allege that they relied on R. Ainbinder's misrepresentations in making the 2020-2022 loans. Although the Complaint is not a model of straightforward pleading, the Spivacks do both (1) state that "[R.] Ainbinder's repeated solicitations led [them] to . . . make a series of convertible loans to NYIAX" (Compl. ¶ 121), and (2) provide quotes and dates regarding at least some of those solicitations (*see e.g.*, Compl. ¶¶ 128, 131.) It is difficult to discern any reason why the Spivacks would have loaned additional money to NYIAX absent being asked to do so by R. Ainbinder, based on the alleged misrepresentations.

Third, the Spivacks adequately allege misrepresentations in connection with their loans. Specifically, R. Ainbinder allegedly lied to them about employee salaries in order to make it seem like the company was strapped for cash, lied about revenues to make it seem like the company was more successful than it was, and repeatedly lied about the likelihood that an IPO was imminent. (*Id.* ¶¶ 128-31). While these claims were made to Mr. Felice rather than directly to the Spivacks, Plaintiffs allege that starting in 2019, "Mr. Felice began to primarily communicate with [R.] Ainbinder . . . on behalf of Plaintiffs," including the Spivacks. (*Id.* ¶ 126.)

Accordingly, the Court dismisses Plaintiffs' Exchange Act claims except for the Spivacks' claims based on the convertible loans they made to NYIAX in 2020-2022.

### b.    Advisers Act

Plaintiffs assert claims under Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C.

§ 80b-6, against R. Ainbinder.  Plaintiffs allege that, in violation of the Act, he "defraud[ed]"

them and "engaged in transactions, practices, or courses of business which operate[d] as a fraud

or deceit upon [them]."  (Compl. ¶ 153.)  R. Ainbinder responds that "no private right of action

exists under the [Act]."  (RA Mem. at 20.)  He is correct insofar as Plaintiffs seek damages or

certain other remedies.  Plaintiffs are correct that the Act does contain a "limited private

remedy . . . to void an investment advisers contract."  *Transamerica Mortg. Advisors, Inc.*

*(TAMA) v. Lewis*, 444 U.S. 11, 24 (1979); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*,

970 F.2d 1030, 1033 (2d Cir. 1992) ("Section 215 of the [Advisers Act] provides that contracts

whose formation or performance would violate the act are void . . . . [T]he Supreme Court held

that this created an implied private cause of action for rescission of the void contract and

restitution and that this was the sole private remedy available under the Advisers Act.").

However, the Complaint does not point to any such contract, rather requesting only damages as a

remedy for R. Ainbinder's alleged fraud.  Nor can the Court identify such a contract elsewhere in

the Complaint.  *See infra* Section III.B.4.a.  Plaintiffs' Advisers Act claims are therefore

dismissed.

### c.    FINRA Unsuitability

R. Ainbinder is correct that there is no private right of action for violations of FINRA

conduct rules.  *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634,

645 (S.D.N.Y. 2020) ("While Defendant is subject to the requirements set by the NYSE, SEC,

and FINRA, there is no private right of action for alleged violations of industry

rules . . . . Accordingly, Plaintiff's claim for 'breach of suitability standards' stemming from

alleged violations of industry rules fails."); *see also Hauptman v. Interactive Brokers, LLC*, 349

F. Supp. 3d 292, 295 (S.D.N.Y. 2018) (same).  Plaintiffs' "unsuitability" claims are therefore

dismissed.  The Court addresses Plaintiffs' derivative negligence claims below.  *See infra*

Section III.B.3.c.

### 2.    Common-Law Fraud

In addition to their Exchange Act claims, Plaintiffs also assert common-law fraud claims

against R. Ainbinder.  Defendants argue that the claims are inadequately pleaded, and otherwise

untimely.  The Court disagrees.

#### a.    Adequacy of Pleading

To state a claim for fraud under New York law, a plaintiff must allege: "(1)

representation of a material fact; (2) falsity; (3) scienter; (4) reasonable reliance; and (5) injury."

*Gate Techs., LLC v. Delphix Cap. Mkts., LLC*, No. 12-CV-7075, 2013 WL 3455484, at *6

(S.D.N.Y. July 9, 2013) (brackets and citation omitted).  In addition, a plaintiff alleging fraud

must satisfy the heightened pleading requirements of Rule 9(b), which requires "(1) specify[ing]

the statements that the plaintiff contends were fraudulent, (2) identify[ing] the speaker, (3)

stat[ing] where and when the statements were made, and (4) explain[ing] why the statements

were fraudulent."  *Schneider v. Pearson Educ., Inc.*, No. 12-CV-6392, 2013 WL 1386968, at *4

(internal citation omitted).  Where there are multiple defendants, "Rule 9(b) requires that the

complaint inform each defendant of the nature of his alleged participation in the fraud."  *Am.*

*Arb. Ass'n, Inc. v. DeFonseca*, No. 93-CV-2424, 1996 WL 363128, at *8 (S.D.N.Y. June 28,

1996).

At a high level, the Court notes that Rule 9(b)'s purpose is to provide notice to

defendants of the substance of the claims against them.  Accordingly, while it requires that

plaintiffs plead their claims with specificity, it should not be interpreted as a strict requirement

that the who, what, when, where, and why of every single misstatement be identified with precision in a complaint. *See Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 290 (S.D.N.Y. 2019) ("[W]hile Plaintiffs do not in every instance ascribe a particular speaker to each of these statements, [Defendants] are wrong to suggest that Rule 9(b) necessarily requires that Plaintiffs do so."). The Second Circuit has been clear that "[i]n determining the adequacy of Plaintiffs' fraud pleadings under [Rule 9(b)'s] various requirements, we view the alleged facts in their totality, not in isolation." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). And it bears repeating that Rule 9(b) does not supplant the general pleading doctrine under the Federal Rules—that is, "[a]t the pleadings stage, the alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Id.* at 174.

R. Ainbinder, as he must, concedes that he made material representations to Plaintiffs when he solicited their investments. The sole exception concerns Mr. Ruta, who is mentioned just twice in the factual recitation of the Complaint. (Compl. ¶¶ 108, 118.) The Complaint does not expressly allege at any point that Mr. Ruta had contact with the Ainbinders or that he was directly solicited. As best as the Court can tell, Mr. Ruta may have become aware of the Ainbinders' misrepresentations secondhand through another Plaintiff—perhaps his nephew-in-law, Mr. Held. The Complaint, however, says nothing about which specific misrepresentations Mr. Ruta heard and relied on, nor about how or when he encountered them. This is insufficient to meet the ordinary *Iqbal* pleading standard, much less the more stringent Rule 9(b) particularity requirement. The Court therefore grants the motion to dismiss as to Mr. Ruta. For largely the

same reasons, Mr. Ruta's other common-law claims must be dismissed as well.[6]  The Court, for now, views it as plausible, based on the complaint, that Ms. Felice, Linda Spivack, and Kathleen Spivack received and relied on the Ainbinders' misrepresentations secondhand through their husbands, and declines to dismiss them from the case on this basis.

Plaintiffs other than Mr. Ruta have adequately alleged loss,[7] arguing that "[NYIAX] shares have no value, there is no secondary market available to Plaintiffs in which they can sell the shares, and NYIAX is unwilling to buy the shares back from Plaintiffs at cost."  (Opp. RA at 15.)  Defendants are incorrect that Plaintiffs must wait to *realize* those losses by selling or otherwise disposing of their shares.  (*Cf.* WP Mem. at 23.)  "Put another way, a driver who is misled into buying a jalopy at a hotrod price need not wait until she is stranded by the side of the road to seek relief."  *Ramiro Aviles*, 380 F. Supp. 3d at 276.

R. Ainbinder does dispute, however, that Plaintiffs have adequately pleaded the remaining elements of fraud—falsity, scienter, and reasonable reliance.  The Court addresses each in turn.

Plaintiffs have pleaded falsity with the requisite particularity.  As explained in part above, *see supra* Section III.B.1.a, Plaintiffs have alleged a multi-year, continuous scheme in which R. Ainbinder repeatedly conveyed to Plaintiffs that a non-existent IPO was imminent (Compl. ¶ 97), that NYIAX was not subject to significant governmental regulation (*id.* ¶ 93), that investing in NYIAX would yield exorbitantly high returns (*id.* ¶ 96), that investing in NYIAX carried little-to-no risk (*id.* ¶ 95), that NYIAX would benefit from a non-existent partnership

---

[6] The remainder of this opinion uses the term "Plaintiffs" to refer to all Plaintiffs *except* Mr. Ruta.

[7] It is unclear in the Second Circuit whether loss must be pleaded at this stage, as opposed to ultimately proved.  In any event, the Court need not decide, as Plaintiffs have adequately pleaded loss here.  *See Loreley Fin.*, 797 F.3d at 174.

with NASDAQ (*id.* ¶ 101), and more.  Plaintiffs allege that each of these representations was

untrue when communicated.  (*Id.* ¶¶ 93-101.)  Plaintiffs also allege key details about these

misrepresentations, including that they were conveyed initially at solicitation meetings held in

early 2016 (*id.* ¶ 92), who attended these solicitation meetings (*id.* ¶¶ 88-89, 91), and where at

least one of the meetings occurred (*id.* ¶ 88).  Plaintiffs similarly provide sufficient factual detail

about allegedly fraudulent misrepresentations communicated to Mr. Felice on behalf of all

plaintiffs in 2019.  (*Id.* ¶¶ 126-37.)  From these allegations, the Court is able to reasonably infer

the plausibility of Plaintiffs' more generic allegations that the misrepresentations continued

between 2017 and 2019.  (*See, e.g.*, *id.* ¶¶ 109-10, 121-25.)  "Although the complaint is hardly a

model" and omits some relevant information—for example, the location of the 2016 solicitation

meeting between the Ainbinders and the Spivacks, and the times and locations of the Ainbinders'

solicitations between 2017 and 2019—"the Court concludes that Plaintiffs have put [Defendants]

on notice of the substance of their fraud claims with the required specificity." *Ramiro Aviles*,

380 F. Supp. 3d at 290.[8]

R. Ainbinder argues that at least some of his alleged misstatements "were made after the

investments were made."  (RA Mem. at 25 (capitalization altered).)  This is immaterial.  The

Complaint is clear that most of the misrepresentations were first communicated at initial

solicitation meetings in early 2016, before any of Plaintiffs had invested.  (Compl. ¶¶ 88-92.)

Those misrepresentations were then repeated over the ensuing years in order to solicit additional

investments, prevent Plaintiffs from pursuing options to get out of their investments, and

---

[8] R. Ainbinder argues that Plaintiffs' use of "Mr. Ainbinder" rather than his and his
brother's first names at all points in the Complaint means that their allegations lack particularity.
(RA Mem. at 24-25.)  The Court agrees with Plaintiffs that context allows the Court to infer
which of the uses refer to R. Ainbinder.  (Opp. RA at 17.)

ultimately prevent Plaintiffs from suing.  (Opp. RA at 5.)  The Court looks at all of Plaintiffs'

allegations in determining whether, considering the totality of the circumstances, the elements of

fraud have been pleaded.  The later misrepresentations that Plaintiffs describe are relevant not

necessarily because they were themselves relied on, but because they allow the Court to infer the

overall plausibility of the alleged fraud.

Next, Plaintiffs have adequately alleged scienter.  Unlike in a securities fraud case, where

plaintiffs must plead scienter "with particularity" (*see* 15 U.S.C. § 78u-4(b)(2)(A)), a plaintiff

alleging common law fraud need only satisfy Rule 9(b), under which "fraudulent intent may be

averred generally."  *Schneider*, 2013 WL 1386968, at *4 (internal quotation marks and citation

omitted).  In a common law fraud action, scienter "can be pleaded by alleging motive and clear

opportunity, or by alleging facts constituting strong circumstantial evidence of conscious

behavior or recklessness on the part of defendants."  *G-I Holdings, Inc. v. Baron & Budd*, No.

01-CV-0216, 2003 WL 193502, at *12 (S.D.N.Y. Jan. 29, 2003) (citing *Powers v. British Vita,

P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995)).  To plead motive, a plaintiff must "allege facts

indicating 'concrete benefits that could be realized by one or more of the false statements and

wrongful nondisclosures.'"  *Id*. (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).

"To plead opportunity, one must allege facts that demonstrate that the defendant is well

positioned to carry out the fraudulent transaction."  *Id*. (internal quotation marks and citation

omitted).  The resulting inference must be "strong," meaning that it must be "cogent and at least

as compelling as any opposing inference one could draw from the facts alleged."  *Loreley Fin.*,

797 F.3d at 177 (quoting *Tellabs*, 551 U.S. at 324).

Here, Plaintiffs have adequately alleged facts constituting strong circumstantial evidence

of conscious or reckless behavior.  The volume, duration, and seriousness of the alleged lies, in

addition to the fact that they continued after Plaintiffs confronted R. Ainbinder and attempted to buy out their shares, allows the inference that R. Ainbinder at least recklessly disregarded the nature and consequences of his representations.

Plaintiffs have also adequately alleged motive and opportunity.  R. Ainbinder was intimately involved in NYIAX, including serving as its CEO (*id.* ¶ 72), as well as an employee of Westpark, which received commissions from its work for NYIAX (*id.* ¶¶ 77-78, 87).  Whether or not R. Ainbinder was entitled to a direct share of Westpark's commissions from the sale of NYIAX, his incentive was to act for the benefit of his employers.  R. Ainbinder also had sufficient opportunity, not only due to his work with Westpark, but because of his alleged personal connections to Plaintiffs.  (*Id.* ¶¶ 79-82.)  "These concrete benefits are enough to suggest that [R. Ainbinder] stood to gain," and that he was "clearly well positioned to carry out the alleged fraud."  *Friar v. Wyndham Vacation Resorts, Inc.*, No. 20-CV-2627, 2021 WL 1062615, at *3 (S.D.N.Y. Mar. 19, 2021).

R. Ainbinder argues that Plaintiffs fail to plead that he "knew the statements were false when made."  (RA Mem. at 27.)  But he is incorrect about the standard for common-law fraud in New York.  Reckless misrepresentations are actionable in addition to intentional ones.  *See Idrees v. Am. Univ. of the Caribbean*, 546 F. Supp. 1342, 1349 (S.D.N.Y. 1982).  Regardless, Plaintiffs have adequately alleged intentional fraud.  While R. Ainbinder might have been legitimately mistaken as to the timing of the IPO—it is, of course, possible that unexpected circumstances caused the repeated deferral of the IPO date—he does not explain how any of the other alleged misrepresentations could ever have been true, particularly the ones that were inconsistent with NYIAX's contemporaneous financial condition.  Moreover, at this stage, the inference of scienter need only be at least as likely as other inferences, not strictly the most likely

inference.  *See supra* Section III.B.1.a.  Looking at the totality of circumstances, the Court concludes that Plaintiffs have adequately alleged that the majority of the statements were intentionally false when made and is able to reasonably infer that statements concerning the IPO were likewise intentionally false when made.

Finally, Plaintiffs have adequately pleaded reasonable reliance.  Plaintiffs point to numerous statements made to them by R. Ainbinder and explain why those statements led them to believe that investing in NYIAX was a prudent decision.  These include, *inter alia*, the lack of regulation, the prospect of extremely high returns, a supportive partnership with NASDAQ, and an impending IPO.  *See supra* Section III.B.1.a.

R. Ainbinder responds that his misstatements were contradicted by the prospectuses that he provided to Plaintiffs, and that the prospectuses warned Plaintiffs not to rely on any contradictory oral representations.  (RA Mem. at 25-26.)  In assessing whether reliance is reasonable, New York courts will look beyond written disclaimers or isolated contractual provisions to the "entire context of the transaction," including "'the sophistication of the parties.'"  *Wurtsbaugh v. Banc of Am. Sec. LLC*, No. 05-CV-6220, 2006 WL 1683416, at *6 (S.D.N.Y. June 20, 2006) (citing *Emergent Cap. Inv. Mgmt. LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)).  Courts are reluctant to find reliance on oral communications to be reasonable where the "plaintiffs are sophisticated parties and the statement or omission relates to a business transaction that has been formalized in a contract."  *Id.*  That is not the situation here. *Cf. Emergent*, 343 F.3d at 196 (describing plaintiff as a "sophisticated investor" where plaintiff had "represented that it had knowledge and experience in financial and business matters, and that it could readily evaluate the risks of the transaction" (internal quotation marks omitted)). Plaintiffs allegedly had no prior experience with private placement investing.  (Compl. ¶¶ 24, 32,

37, 47.)  Some of them had no experience with active investing at all, maintaining only

retirement portfolios with conservative risk profiles.  (*Id.* ¶¶ 58, 63.)  Several of the Plaintiffs

also had allegedly close personal relationships with R. Ainbinder, increasingly the likelihood that

they would trust him rather than relying on their independent investment knowledge.  (*Id.* ¶ 79.)

Moreover, "[a] disclaimer is generally enforceable only if it 'tracks the substance of the

alleged misrepresentation.'"  *Caiola*, 295 F.3d at 330 (quoting *Grumman Allied Indus., Inc. v.

Rohr Indus., Inc.*, 748 F.2d 729, 735 (2d Cir. 1984)); *see also Mfrs. Hanover Trust Co. v.

Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) (explaining that a valid disclaimer provision must "must

contain explicit disclaimers of the particular representations that form the basis.")  Indeed,

"[s]tanding alone . . . a general disclaimer . . . is not sufficient as a matter of law to preclude

reasonable reliance on material factual misrepresentations, *even by a sophisticated investor*."

*FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) (emphasis added).

While R. Ainbinder is correct that the Private Placement Memoranda ("PPMs") do

disclaim some of his oral misrepresentations, they do not disclaim all of them.  For example,

R. Ainbinder allegedly conveyed to Mr. Felice in 2020 both that NYIAX had cut employee

salaries in an effort to stay afloat, and that NYIAX was increasingly experiencing negative

revenues.  (Compl. ¶¶ 128-30.)  The PPMs also do not disclaim R. Ainbinder's repeated

assurances that an IPO was imminent.  (*See, e.g.*, *id.* ¶ 131.)  At least some Plaintiffs—the

Spivacks—relied on these representations in making further investments.  The other Plaintiffs

relied on these representations in deciding to hold their investments, and in deferring their

ultimate decisions to sue.  *See supra* Section III.B.2.a.

Plaintiffs also allege that R. Ainbinder continued to misrepresent things to them after

providing them with the PPMs.  For example, the first PPM is, according to R. Ainbinder, dated

May 26, 2016.  (RA Mem. at 11.)  Plaintiffs allege that many of them did not finalize their

investments until late June 2016.  (Compl. ¶¶ 105-08.)  Mr. Carey invested an additional sum in

August 2016.  (*Id.* ¶ 116.)  The same pattern is apparent in 2017—the PPM was dated January

24, 2017 (RA Mem. at 11), but many of Plaintiffs did not invest until months later (*see, e.g.,*

Compl. ¶¶ 115, 118.)[9]  The Court therefore declines to conclude, as a matter of law, that all of

the Ainbinders' solicitations occurred before their provision of the PPMs.  This is not a case in

which "a written agreement [is relevant] to the reasonableness of a party's reliance on *pre-*

*contract* factual misrepresentations."  *FIH, LLC*, 920 F.3d at 141 (emphasis added).

R. Ainbinder also responds that Plaintiffs cannot have reasonably relied on his alleged

misstatements because they were so facially absurd that they were really nothing but "puffery."

(RA Mem. at 26-27.)  While some of R. Ainbinder's statements are likely so extreme as to

constitute puffery—for example, his claim that only a "nuclear holocaust" could prevent

Plaintiffs from earning large returns (Compl. ¶ 95)—the majority of the alleged misstatements

concern technical attributes of the NYIAX investments that reasonable investors would plausibly

rely on.  These include R. Ainbinder's statements about the lack of strict government regulation,

the partnership with NASDAQ, the impending IPO date, cutting salaries of employees, and

NYIAX's strong revenues.  *See supra* Section III.B.2.a.

        **b.**      **Timeliness**

In addition to challenging the substance of Plaintiffs' allegations, R. Ainbinder argues

that their fraud claims are untimely.  (*See* WP Mem. at 13; RA Mem. at 17.)  New York law

provides that a fraud action must be commenced within "the greater of six years from the date

---

[9] In both cases, the Spivacks invested earliest, but still roughly one week after receiving
the PPMs.  (Compl. ¶¶ 107, 117.)

the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8).  Here, as before, he acknowledges that Plaintiffs' filing of their FINRA action stopped the limitations clock, so the relevant accrual date is six years prior to March 1, 2023.  He therefore attempts to exclude violations occurring before March 1, 2017, including his initial solicitations and many of Plaintiffs' initial purchases.

The Court concludes that Plaintiffs' fraud claims are timely.  First, the relevant statutes of limitations were tolled in New York between March 20, 2020, and November 3, 2020, a period of 228 days, pursuant to Executive Order 202.8.  *See Natale v. Allied Aviation Servs., Inc.*, No. 23-CV-7260, 2024 WL 3794615, at *5 (S.D.N.Y. Aug. 13, 2024).  This makes July 16, 2016, the date after which Plaintiffs' claims must have accrued—just months after the Plaintiffs were first solicited (in early 2016) and made their initial investments (in May and June 2016).  (Compl. ¶¶ 105-08.)  Therefore, at least allegations relating to purchases that occurred after this date are timely.

Second, Plaintiffs allege that between 2016 and 2023, R. Ainbinder perpetrated an "ongoing scheme" to share misinformation with Plaintiffs, in part in order to secure additional investments in NYIAX.  (*See, e.g.*, *id.* ¶¶ 115-21, 126-43.)  While Plaintiffs' counsel does not use the phrase "continuing violation," the Court understands them as invoking the "continuing violation" doctrine, which "is usually employed where there is a series of continuing wrongs and [which] serves to toll the running of a period of limitations to the date of the commission of the last wrongful act."  *Henry v. Bank of Am.*, 147 A.D.3d 599, 601 (1st Dep't 2017) (quoting *Selkirk v. State*, 249 A.D.2d 818, 819(3d Dep't 1998)).  It is true that "where a plaintiff asserts a single breach—with damages increasing as the breach continued—the continuing wrong theory does

not apply," *id.*; however, Plaintiffs' fraud claims here were not complete at the time of their

initial investments, *cf. Ramiro Aviles*, 380 F.Supp.3d at 289.  Rather, based on continued

misrepresentations, R. Ainbinder solicited and secured additional investments after July 2016

from all Plaintiffs.  (Compl. ¶¶ 114, 115-18.)  At the very least, Plaintiffs have alleged that the

fraud that commenced with their initial investments in 2016 continued through the subsequent

year, bringing them within the six-year statute of limitations.[10]

Third, under New York's "discovery rule," Plaintiffs' claims remain viable if they were

brought within "two years from the time [they] discovered the fraud, or could with reasonable

diligence have discovered it."  N.Y. C.P.L.R. § 213(8).  In other words, Plaintiffs' claims

accrued only when they would have been able to uncover the alleged fraud through reasonable

diligence.  Determining when discovery was reasonably possible turns on when Plaintiffs

"w[ere] 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred.'"

*Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) (last alteration in original) (quoting *Erbe v.*

*Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957)).  Specifically, "[a] duty of inquiry arises

when the facts would suggest fraud to a person of ordinary intelligence."  *United Teamster Fund*

*v. MagnaCare Admin. Servs., LLC*, 39 F.Supp.3d 461, 477 (S.D.N.Y. 2014).  And once a set of

triggering facts has put a plaintiff on inquiry notice, "knowledge of a fraud" is imputed to the

plaintiff unless she undertakes some "investigative efforts" in response.  *Cohen v. S.A.C. Trading*

*Corp.*, 711 F.3d 353, 361 (2d Cir. 2013).

---

[10] It is possible that, without the tolling of all New York statutes of limitations due to
COVID, Mr. Carey might not benefit from the continuing violation doctrine, as his final
investment occurred "[o]n or about August 10, 2016."  (Compl. ¶ 116.)  However, because of
Executive Order 202.8, the relevant accrual date is July 16, 2016.  *Natale*, 2024 WL 3794615, at
*5.  Mr. Carey can therefore plausibly claim that the Ainbinders continued to defraud him into
the period during which his claims must have accrued.

The allegations support a reasonable inference that a reasonably diligent investor would not have discovered R. Ainbinder's fraud until at least March 2021. Many of the fraudulent claims would only have become apparent over a substantial period of time, such as R. Ainbinder's allegedly false claim that an IPO was impending within eighteen months. (Compl. ¶¶ 97, 119.) Plaintiffs also argue that R. Ainbinder continued to reinforce and explain away his misrepresentations "in order to conceal [his] wrongdoing from Plaintiffs over the course of several years." (Opp. RA at 13.) This included continually offering explanations for the delayed IPO and promising that it would occur in the near future. (*See, e.g.*, Compl. ¶¶ 125, 132, 139.) In addition, Plaintiffs allege that the first concrete proof of R. Ainbinder's misrepresentations came in 2022 when NYIAX filed disclosures with the SEC. (*See* Compl. ¶¶ 129-30.) In any event, whether Plaintiffs were on "inquiry notice" of fraud is a highly factual determination and it is "often inappropriate" to resolve the matter on a motion to dismiss, though a court may do so if "the facts on the face of the complaint and related documents" are sufficient to establish a "duty of inquiry" as a matter of law. *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (quotation marks omitted). Here, it is far from clear that Plaintiffs were on notice as a matter of law.

Finally, while the Court recognizes that R. Ainbinder's fraud, at least as alleged by Plaintiffs, was brazen and might have been apparent to a sophisticated investor, he also allegedly engaged in a multi-year effort to deepen and then cover up that fraud. Therefore, even if the Court were to agree with Defendants on the substance of their statute-of-limitations arguments, Plaintiffs can plausibly invoke equitable tolling to preserve their claims.[11] As a general rule,

---

[11] Confusingly, Plaintiffs' briefing appears to label their arguments as "equitable estoppel" only in the context of their negligence, negligent misrepresentation, and breach of fiduciary duty claims, not their fraud claims. (Opp. RA at 13.) It is unclear why Plaintiffs do so,

"the doctrines of equitable tolling or equitable estoppel" under New York law may "defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007) (citations and internal quotation marks omitted). Whether labeled as equitable estoppel or tolling, the doctrines "appl[y] where it would be unjust to allow a defendant to assert a statute of limitations defense" because "the defendant's affirmative wrongdoing . . . produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Willensky v. Lederman*, No. 13-CV-7026, 2015 WL 327843, at *6 (S.D.N.Y. Jan. 23, 2015) (quoting *Zumpano v. Quinn*, 6 N.Y.3d 666, 673 (2006); *see also Twersky v. Yeshiva Univ.*, 993 F.Supp.2d 429, 442 (S.D.N.Y. 2014), *aff'd*, 579 F. App'x 7 (2d Cir. 2014).

On the one hand, equitable estoppel is typically treated as "a question of fact, which should be fully developed and determined upon the trial of the action." *Dist. Attorney of N.Y. Cty. v. Republic of the Phil.*, No. 14-CV-890, 2016 WL 9022580, at *5 (S.D.N.Y. Jan. 20, 2016) (quoting *St. John's Univ. v. Bolton*, 757 F.Supp.2d 144, 187 (E.D.N.Y. 2010)). On the other hand, it is an "extraordinary remedy," *Twersky v. Yeshiva Univ.*, 579 F. App'x 7, 10 (2d Cir. 2014) (quoting *Clark v. Ravikumar*, 935 N.Y.S.2d 633, 635 (2d Dep't 2011)), appropriate "only under exceptional circumstances," *id.* (quoting *Gross v. N.Y.C. Health & Hosps. Corp.*, 505

---

particularly as their fiduciary duty claim is based on their underlying fraud claim. (*See id.* at 12.) Regardless, Plaintiffs do allege all of the underlying elements of an equitable tolling claim—namely, continuing misrepresentations by R. Ainbinder that were intended to and had the effect of preventing them from filing suit against him within the limitations period. (*See, e.g.*, Opp. WP at 7 ("Plaintiffs here have clearly alleged a continuous and ongoing fraud carried out by Defendants, which prevented them from liquidating their NYIAX investments in reliance on Defendants' continuing misrepresentations, and from pursuing litigation against Defendants.").) Therefore, while it is true that "[i]t is the [p]laintiff's burden to establish facts entitling him to equitable tolling," *Willensky*, 2015 WL 327843 at *6 (quotation marks omitted), the Court reads Plaintiffs' briefing as raising the argument and alleging facts sufficient to sustain it.

N.Y.S.2d 678, 679 (2d Dep't 1986)).  "When the claims are prima facie barred by the statute of limitations, the plaintiff must make sufficient factual allegations that each of the requirements of equitable estoppel is satisfied, or at least raise an issue of fact as to whether equitable estoppel applies."  *Twersky*, 993 F. Supp. 2d at 443.  For most common-law claims, plaintiffs need only adduce sufficient factual allegations for equitable estoppel to *plausibly* apply.  Courts disagree on whether, when a fraud claim is at issue, the allegations supporting equitable estoppel must also satisfy Rule 9(b)'s particularity requirement.  *See id.* at 443 n.5 (collecting cases).

Regardless of whether Rule 9's elevated pleading standard applies here, Plaintiffs' allegations are sufficient.  They clearly allege ongoing deceptive conduct by R. Ainbinder.  They provide specific parties, dates, and even quotes for a large number of these misrepresentations, continuing even through early 2023.  (*See, e.g.*, Compl. ¶¶ 128, 131, 132, 141-43; ECF No. 1-3.)  And they allege that these misrepresentations both led to further investments and disguised the fraudulent nature of the Ainbinders' initial solicitations.  In light of Defendants' "repeated assurances that they were continuing to work in Plaintiffs' best interests, the complaint plausibly establishes that Plaintiffs were entitled to rely on those assurances and to forbear challenging the agreement in court until the breakdown of the fiduciary relationship had become clear and known to them."  *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 298 (S.D.N.Y. 2019) (cleaned up).  Plaintiffs have therefore plausibly invoked equitable tolling and the Court declines to dismiss their common-law fraud claims as untimely.

### 3.    Other Common-Law Torts

Plaintiffs assert several other common-law tort claims against R. Ainbinder, including negligent misrepresentation (Count Four), breach of fiduciary duty (Count Five), and ordinary negligence (Count Eleven).  R. Ainbinder first responds that such claims are, at least in part, untimely.  Plaintiffs respond, *inter alia*, that R. Ainbinder is equitably estopped from asserting

such statute-of-limitations defenses.  (Opp. RA at 9.)  For the reasons explained above, the Court

agrees that Plaintiffs can plausibly assert equitable estoppel here, and therefore declines to

dismiss these claims as untimely.  *See supra* Section III.B.2.b.  Because equitable estoppel

applies, the Court need not analyze other bases for rejecting R. Ainbinder's statute-of-limitations

defenses at this time.

R. Ainbinder also objects to the substance of Plaintiffs' pleading.  The Court addresses

the substance of each claim in turn.

### a.    Negligent Misrepresentation

Plaintiffs assert a claim for negligent misrepresentation, alleging that R. Ainbinder had a

"special duty to provide accurate information about NYIAX to Plaintiffs."  (Compl. ¶ 166.)  To

state a claim of negligent misrepresentation under New York law, a plaintiff must allege that "(1)

the defendant had a duty, as a result of a special relationship, to give correct information; (2) the

defendant made a false representation that he or she should have known was incorrect; (3) the

information supplied in the representation was known by the defendant to be desired by the

plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the

plaintiff reasonably relied on it to his or her detriment."  *Hydro Invs., Inc. v. Trafalgar Power

Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).  "[I]n cases where, as here, the negligent misrepresentation

claim is based on the same set of facts as those upon which a fraud claim is grounded, Rule 9(b)

applies to the negligent misrepresentation claim as well."  *Eaves v. Designs for Fin., Inc.*, 785 F.

Supp. 2d 229, 254-55 (S.D.N.Y. 2011).  New York law has long defined the special relationship

necessary to support a negligent-misrepresentation claim as "either privity of contract between

the plaintiff and the defendant or a relationship 'so close as to approach that of privity.'"  *Sykes

v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 372 (2010) (quoting *Ultramares Corp. v.*

*Touche*, 255 N.Y. 170, 182-83 (1931)).  To establish such a relationship, a plaintiff must show among other things that she was a "known party" in whom the defendant's alleged misstatement was intended to induce reliance.  *Id*. at 373 (quoting *Credit All. Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)).

R. Ainbinder argues that there was no "special relationship" because he was "not the broker for any of Plaintiffs' accounts at WestPark" and "never provided . . . investment advice pursuant to any account agreement."  (RA Mem. at 28.)  Under New York law, however,  "a fiduciary relationship embraces not only those the law has long adopted—such as trustee and beneficiary—but also more informal relationships where it can be readily seen that one party reasonably trusted another."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150-51 (2d Cir. 1993).  This kind of informal trust relationship extends even to "close friends or family members."  *Id.* at 151; *see also Apple Recs., Inc. v. Capitol Recs., Inc.*, 529 N.Y.S.2d 279, 283 (1988) ("A fiduciary relationship, whether formal or informal . . . might be found to exist, in appropriate circumstances, between close friends."); *Penato v. George*, 52 A.D.2d 939, 942 (2d Dep't 1976) (same).  Such a fiduciary relationship is less likely to be found where, for example, "a sophisticated prospective investor attends a sales meeting with a heretofore unknown corporate officer," *Brass*, 987 F.2d at 151, than where "the plaintiff was a less sophisticated party who was allegedly defrauded by someone who held himself out to be an expert and repeatedly guided the actions of the plaintiff throughout the relationship."  *Koh v. Koo*, No. 22-CV-6639, 2023 WL 5352786, at *6 (S.D.N.Y. Aug. 21, 2023) (citing *Penato*, 52 A.D.2d at 942).  Factors that are relevant in evaluating the closeness of the relationship include whether one party exerted "significant influence" over the other and whether the reliant party "placed a level of

trust and confidence" in the alleged fiduciary. *See Holmes v. Lorch*, 329 F. Supp. 2d 516, 527 (S.D.N.Y. Aug. 10, 2004).

Here, Plaintiffs have plausibly pleaded the existence of such a special relationship, even if R. Ainbinder did not sign a formal contract to be their broker. Not only did most of the Plaintiffs know R. Ainbinder as a friend prior to his solicitations, but the solicitations occurred in intimate, personal settings. R. Ainbinder was allegedly the more knowledgeable party, and he had access to inside information about NYIAX by virtue of his concurrent employment at both NYIAX and WestPark. And none of the Plaintiffs can reasonably be characterized as sophisticated investors, having never participated in private placement investing before. These kinds of dealings appear more akin to an informal fiduciary relationship, rather than a series of arms-length transactions.

R. Ainbinder also claims that "Plaintiffs do not allege any facts that [he] 'should have known' were incorrect," that "the alleged misrepresentations and omissions were disclosed to the Plaintiffs through the PPMs," and that "a large number of the alleged statements cannot have been relied upon." (RA Mem. at 28-29.) For the same reasons that these arguments were unavailing in the context of Plaintiffs' fraud claims, they are unavailing here. *See supra* Section III.B.2.a. The Court therefore declines to dismiss Plaintiffs negligent misrepresentation and omission claims as to R. Ainbinder.

### b.    Breach of Fiduciary Duty

Plaintiffs next assert a claim for breach of fiduciary duty. In New York, such a claim requires "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citations omitted). Fraud "is not an element of a claim for breach of fiduciary duty," *In re*

*Grumman Olson Indus., Inc.*, 329 B.R. 411, 429 (Bankr. S.D.N.Y. 2005), but when a breach of fiduciary duty claim "sounds in fraud," it must be pleaded with particularity based on Rule 9(b), *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 442 (S.D.N.Y. 2015).

As explained in the previous section, R. Ainbinder plausibly stood in a fiduciary relationship to Plaintiffs. *See supra* Section III.B.3.a. R. Ainbinder points to *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97-CV-4978, 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999) as "guiding" (RA Mem. at 30), but it is inapposite. The party seeking to establish a fiduciary relationship in that case failed to allege "other factors demonstrating the existence of a relationship . . . such as allegations of past dealings or prior relationships," and "fail[ed] to mention which [parties] were solicited, how that was accomplished, [or] what specifically [was] communicated . . . ." *A.I.A. Holdings,* 1999 WL 47223, at *6. Here, Plaintiffs have alleged prior relationships with R. Ainbinder and have provided considerably more detail about their dealings.

For the same reasons that Plaintiffs have successfully pleaded scienter and damages for their fraud claims, the Court also concludes that they have satisfied the "knowing breach" and "damages" elements for this claim. *See supra* Section III.B.2.a. And, as with their fraud claims, they have pleaded their claims with particularity. The Court therefore declines to dismiss Plaintiffs' breach of fiduciary duty claims as to R. Ainbinder.

### c.    Negligence

Plaintiffs' third common-law tort claim is styled as sounding in negligence. According to Plaintiffs, "[a] broker/dealer is liable for negligence if it fails to perform the duties of care imposed upon it as a fiduciary," and "evidence of violation of industry standards is admissible as non-conclusive evidence of negligence." (Compl. ¶ 210 (quoting *Mihara v. Dean Witter & Co.,*

*Inc.*, 619 F.2d 814, 824 (9th Cir. 1980)).)[12]  Plaintiffs allege that R. Ainbinder breached these duties by "fail[ing] to provide accurate information" about NYIAX and failing to disclose his "regulatory and disciplinary histor[y]."  (*Id.* ¶ 212.)  In their briefing, Plaintiffs explain that they have "demonstrate[d] Defendant's . . . negligence by its failure to meet the standards set forth in FINRA's rules."  (Opp. RA at 13 (capitalization altered).)

Plaintiffs' negligence "claim[s], however, [are] derivative and duplicative of [their] breach of suitability standards claim[s]; the complaint's references to a duty of care and negligence are coupled with, or virtually identical to, the allegations regarding alleged violations of industry rules."  *Valelly*, 464 F. Supp. 3d at 645.  "Plaintiff cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty."  *Id.*; *see also In re Series 7 Broker Qualification Exam Scoring Litig.*, 510 F. Supp. 2d 35, 47 (D.D.C. 2007), *aff'd*, 548 F.3d 110 (D.C. Cir. 2008) (explaining that "courts have logically concluded that the Exchange Act preempts common-law claims that are nothing more than disguised actions to enforce regulatory duties").

To the extent that Plaintiffs' negligence claims are predicated on FINRA unsuitability, they must be dismissed.  To the extent that such claims are distinct from Plaintiffs' unsuitability claims, they are duplicative of their negligent misrepresentation and fiduciary duty claims, and must likewise be dismissed.  (*See, e.g.*, Compl. ¶ 210 ("A broker/dealer is liable for negligence if it fails to perform the duties of care imposed upon it as a fiduciary. . . .").)

---

[12] Confusingly, Plaintiffs assert that there is case law in the "Second and Ninth Circuit[s]" supporting this kind of claim, but then only cite cases from the Ninth Circuit and a Florida state court.  Out of an abundance of caution, the Court warns Plaintiffs' counsel to be careful not to erroneously represent existing case law, or its absence, in future filings.

### 4.    Contract Claims

#### a.    Breach of Contract

Plaintiffs next assert claims for breach of contract.  According to the Complaint, this breach occurred in three ways: (1) negligent solicitation of Plaintiffs' investments, (2) breach of "the fiduciary duty owed to Plaintiff[s] by reason of the contractual relationship and the duties, laws, rules, and regulations thereby incorporated," and (3) violation of "state and federal securities laws."  (Compl. ¶ 182.)

R. Ainbinder argues that there was no contract between him and the Plaintiffs.  (RA Mem. at 31.)  Rather, the "subscription agreements and shareholder agreements" that Plaintiffs point to (Compl. ¶ 180) "were exclusively between the individual Plaintiffs and NYIAX."  (RA Mem. at 31.)  Plaintiffs respond that R. Ainbinder breached his duties under the *customer agreements* that Plaintiffs signed with WestPark and NYIAX.  (Opp. RA at 22.)  This argument is not in the Complaint, which mentions only the subscription and shareholder agreements.  In any event, Plaintiffs do not explain why R. Ainbinder is *personally* liable for contracts that he executed as an agent of his employer(s).  Plaintiffs do argue that R. Ainbinder "owed them a contractual duty to comply with the standards set forth in FINRA's rules . . . ."  (*Id.*)  They do not, however, identify any explicit or implicit contract between themselves and R. Ainbinder that converted those industry conduct rules into privately enforceable obligations.

In any event, even if there were a contract, none of the alleged breaches are sufficient as a matter of law.  First, Plaintiffs argue that R. Ainbinder "negligently perform[ed] duties of supervision and due care with respect to the solicitation of Plaintiffs."  (Compl. ¶ 182.)  Plaintiffs point to no contractual provision from which these so-called duties might spring.  "Under New York law, before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."  *Sang Lan v. Time Warner,*

*Inc.*, No. 11-CV-2870, 2014 WL 764250, at *2 (S.D.N.Y. Feb. 25, 2014) (quotation marks omitted).  To state a claim for breach of contract, "a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue."  *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003).  Plaintiffs have failed to do so here.

Second, Plaintiffs argue that R. Ainbinder breached by failing to adhere to the "duties, laws, rules, and regulations thereby incorporated which govern the transactions in Plaintiffs' account."  (Compl. ¶ 182.)  As explained above, however, Plaintiffs lack a freestanding private right of action to enforce industry regulations and rules.  *See supra* Section III.B.1.c.  Under such circumstances, Plaintiffs are "precluded from creating a private cause of action for violations of these rules and regulations by fashioning her claim as one for breach of contract based on violations of rules and regulations impliedly incorporated into the agreement."  *Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 414 (2d Cir. 2009).

Because Plaintiffs have failed to plead the existence of a contract or a violation thereof, their breach of contract claims against R. Ainbinder must be dismissed.

### b.    Breach of the Duty of Good Faith & Fair Dealing

Under New York law, a claim for breach of the duty of good faith and fair dealing must be dismissed when a plaintiff fails to adequately plead the existence of a contract.  *See Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017) ("[A] claim for breach of the implied covenant of good faith and fair dealing must be dismissed when there is no valid and enforceable contract between the parties."); *Lodging Sols., LLC v. Miller*, No. 19-CV-10806, 2020 WL 6875255, at *9 (S.D.N.Y. Nov. 23, 2020) (same).  Because Plaintiffs have not

adequately pleaded the existence of a contract with R. Ainbinder, they cannot plead a breach of the implied duty of good faith.  Their claims for the latter are therefore dismissed.

### C.    Westpark

Against WestPark, Plaintiffs assert statutory claims under the Exchange Act and FINRA's conduct rules, a variety of common law tort claims, and claims for breach of contract and of the implied duty of good faith and fair dealing.  In the Complaint, it is not always clear whether Plaintiffs mean to assert such claims against WestPark on a direct basis, based on a theory of vicarious liability for the actions of the Ainbinders, or both.  Where both theories are apparent in the Complaint, the Court addresses both.

### 1.    Statutory Claims

#### a.    Exchange Act

Plaintiffs identify no agents or principals of WestPark who engaged in misconduct other than the Ainbinders, so the Court construes their Exchange Act claims as based on vicarious liability.  Accordingly, Plaintiffs Exchange Act claims are dismissed except for the Spivacks' claims based on the convertible loans they made to NYIAX in 2020-2022.  *See supra* Section III.B.1.a.  Regarding those claims, there are two possible bases for WestPark's vicarious liability: Section 20(a) of the Exchange Act, and liability under a *respondeat superior* theory.

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), establishes "control person liability."  *McIntosh v. Katapult Holdings, Inc.*, No. 21-CV-7251, 2023 WL 5049044, at *14 (S.D.N.Y. Aug. 8, 2023).  "In order to establish a *prima facie* case of liability under [Section] 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal citation omitted).  Here, Plaintiffs point to no "controlling person"

other than the Ainbinders, nor do they allege "culpable participation," which "[m]ost courts in

this district have held . . . [to be] a scienter requirement for which a plaintiff must allege some

level of culpable participation at least approximating recklessness." *In re Mylan N.V. Sec. Litig.*,

379 F. Supp. 3d 198, 215-16 (S.D.N.Y. 2019) (quotation marks omitted).

That leaves *respondeat superior*. "Under that doctrine, an employer can be held

'vicariously liable for torts committed by an employee acting within the scope of employment so

long as the tortious conduct is generally foreseeable and a natural incident of the employment.'"

*Zanfardino v. City of New York*, 230 F. Supp. 3d 325, 338 (S.D.N.Y. 2017) (*quoting RJC Realty

Holding Corp. v. Republic Franklin Ins. Co.*, 2 N.Y.3d 158, 164 (2004)) (internal ellipsis

omitted). Although there has been some disagreement, courts in this Circuit have generally

concluded that *repondeat superior* is a viable theory of liability in statutory securities cases. *See,

e.g.*, *In re Parmalat Sec. Litig.,* 474 F. Supp. 2d 547, 551 (S.D.N.Y. 2007) ("[A] principal, in

consequence of its status, may be held liable on the basis of *respondeat superior* for a 10b-5

violation committed by its agent."); *Vento & Co. of New York v. Metromedia Fiber Network,

Inc.*, No. 97-CV-7751, 1999 WL 147732, at *12 (S.D.N.Y. Mar. 18, 1999) ("This Court finds

persuasive the reasoning of those courts that have found that an agency theory of liability

remains viable . . . under Rule 10b-5 . . . ."); *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716

(2d Cir. 1980) ("[T]here is no warrant for believing that Section 20(a) was intended to narrow

the remedies of the customers of brokerage houses or to create a novel defense in cases otherwise

governed by traditional agency principles."); *Sec. & Exch. Comm'n v. Im*, No. 17-CV-3613,

2018 WL 840094, at *4 (S.D.N.Y. Feb. 12, 2018) (same); *but see In re Glob. Crossing, Ltd. Sec.

Litig.*, No. 02-CV-910, 2005 WL 1907005, at *3 (S.D.N.Y. Aug. 8, 2005) ("[T]he Second

Circuit has cautioned against using ordinary common law principles like respondeat superior in interpreting the securities laws.").[13]

The key dispute concerns whether pure *respondeat superior* liability conflicts with Section 10(b)'s reliance requirement.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994); *Wright v. Ernst & Young, LLP*, 152 F.3d 169, 174 (2d Cir. 1998).  Justice Stevens's dissent in *Central Bank* forecast the issue arising here, noting that "many courts . . . have imposed liability in § 10(b) actions based upon *respondeat superior* and other common-law agency principles" and that "[t]hese decisions likewise appear unlikely to survive the Court's decision."  *Central Bank*, 511 U.S. at 200 n.12 (Stevens, J., dissenting). While the Second Circuit had previously weighed in on the applicability of *respondeat superior* to securities law cases, *see Marbury Mmgt.* 629 F.2d at 716, it has not revisited the issue since *Central Bank*.

Given the lack of binding Second Circuit precedent, this Court finds the opinions in *Vento* and *Parmalat* persuasive.  *Central Bank* limited "liability under Rule 10b-5" to "conduct specifically prohibited by the text of the statute," but "[f]inding liability under Rule 10b-5 based on an agency theory . . . would not extend liability beyond the activity proscribed by the statute." *Vento*, 1999 WL 147732, at *12 (quotation marks omitted).  "*Central Bank* and *Wright* left *respondeat superior* liability untouched," as "[t]he issue in *Central Bank* and *Wright* . . . was the nature of the conduct that subjects one to Section 10(b) and Rule 10b-5 liability," and "[n]either involved the entirely distinct question whether a principal, in consequence of its status, may be

_____

[13] According to at least one other court this district, the language in *Global Crossing* about *respondeat superior* is dicta.  *Parmalat*, 474 F. Supp. 2d at 553 ("The observations about the need for caution in expanding *respondeat superior* in the securities law context appear to have been dicta.")

held liable on the basis of *respondeat superior* for a 10b-5 violation committed by its agent."
*Parmalat*, 474 F. Supp. 2d at 551; *see also Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("[I]n *Central Bank* and *Wright* there was no allegation that the defendants were agents of the alleged defrauder, acting for the defrauder.").  "Indeed if Central Bank had precluded the liability of a principal for the misconduct of its agent, that decision would have prevented any liability by corporations or partnerships under Rule 10b-5 since such legal entities can only act through their natural agents.  There is no indication that the Supreme Court intended such a drastic restriction on the possible defendants in securities fraud lawsuits."  *Vento*, 1999 WL 147732, at *13; *see also Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 430 (S.D.N.Y. 2000), *abrogated on other grounds by In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ("I agree with those courts that have held that agency liability must survive *Central Bank* in order to ensure that corporations remain subject to § 10(b).").

    At most, *Central Bank* and *Wright* act as limitations on the *respondeat superior* doctrine, requiring that plaintiffs prove the statutory requirement of reliance.  *Gabriel Cap*, 122 F. Supp. 2d at 430 ("[T]he continuing vitality of agency liability must be reconciled with the concern expressed by the Supreme Court and Second Circuit that a defendant not be held liable as a primary violator under § 10(b) without an adequate showing of reliance."); *see also Wright*, 152 F.3d at 175 ("[A] secondary actor cannot incur primary liability under the [Exchange] Act for a statement not attributed to that actor at the time of its dissemination.  Such a holding would circumvent the reliance requirements of the Act . . . .").  With this constraint, "a principal can be liable under § 10(b) for the misrepresentations of its agent only if the person to whom the misrepresentations were made knows that the agent is acting under the actual or apparent

41

authority of the principal." *Gabriel Cap*, 122 F. Supp. 2d at 431. That constraint is easily

satisfied here, as Plaintiffs at all times knew that the Ainbinders were working for Westpark.

Accordingly, Westpark is liable for securities fraud committed by the Ainbinders during

their employment. However, because the claims stemming from the period of the Ainbinders'

employment must be dismissed, so too must the claims against WestPark from that period.

A separate question is whether Westpark is liable for the Ainbinders' conduct during the

period when the Ainbinders were not actively employed. At least some of the Ainbinders'

conduct occurred after both brothers left Westpark, though R. Ainbinder later returned to the

company in 2022. Specifically, the Spivacks' convertible loans were executed between August

2019 and November 2022, while R. Ainbinder was *not* a registered agent of WestPark. (Compl.

¶ 121; WP Mem. at 18-19.) While liability under a *respondeat superior* theory generally extends

only to conduct committed in the course of employment, there are at least two exceptions to that

principle.

First, an employer can be liable if it exercises control over an individual outside of a

formal or legal employment relationship. In assessing whether an informal employer-employee

relationship exists, "New York courts use the 'degree of control' test . . . [and] it applies to

*respondeat superior* liability for tort claims." *Robles v. Holy See*, No. 20-CV-2106, 2021 WL

5999337, at *9 n.14 (S.D.N.Y. Dec. 20, 2021). For example, in allowing claims against a non-

employer to proceed to trial, one court observed that "the liability of [public hospitals based on

the actions of privately employed doctors practicing within them] under the theory of *respondeat

superior* cannot be determined solely from the nature of the legal relations between the parties,

but, rather, must include consideration of the degree of control each in fact exercised. Such is a

question of fact which must be determined at trial." *Kearney v. GVGHA*, 480 N.Y.S.2d 435, 442

(Sup. Ct. 1984), *aff'd*, 497 N.Y.S.2d 1010 (4th Dept. 1985); *accord Gyalpo v. Holbrook Dev. Corp.*, 577 B.R. 629, 639-40 (E.D.N.Y. 2017) (emphasizing the "degree of control exercised by the purported employer over the results produced or the means used to achieve the results," "as opposed to the economic reality of the situation" (quotation marks omitted)).  Similarly, *respondeat superior* liability can lie against independent contractors when the services "are accepted in the reasonable belief that [they] are being rendered by the employer or by his servants."  *Miles v. R & M Appliance Sales, Inc.*, 26 N.Y.2d 451, 454 (1970).

Second, an employer can be liable if it later ratifies the misconduct of an agent, even if the agent was not authorized to commit the misconduct at the time.  *See Maung Ng We v. Merrill Lynch & Co.*, No. 99-CV-9687, 2000 WL 1159835, at *8 (S.D.N.Y. Aug. 15, 2000) ("[R]atification is: 'the adoption and confirmation by one person with knowledge of all material facts, of an act or contract performed or entered into on his behalf by another who at the time assumed without authority to act as his agent.'" (quoting *Black's Law Dictionary* 1262 (6th ed. 1990)); *see also Prisco v. New York*, 804 F. Supp. 518, 523 (S.D.N.Y. 1992) ("Ratification is the express or implied adoption of acts of another by one for whom the other assumes to be acting but without authority.").  Ratification occurs "where the principal has full knowledge of all material facts and takes some action to affirm the agent's actions."  *Prisco*, 804 F. Supp. at 523.  "If the principal accepts the benefits of its agent's misdeeds, with actual or imputed knowledge, it ratifies the agent's action."  *Hewett v. Marine Midland Bank of Se. New York, N.A.*, 449 N.Y.S.2d 745 (2d Dep't 1982); *accord Prisco*, 804 F. Supp at 524.

Here, WestPark argues that R. Ainbinder was not "registered with WestPark" between August 2019 and November 2022.  (WP Mem. at 18-19.)  In response, Plaintiffs allege that R. Ainbinder's actions were "for the benefit of WestPark."  (Opp. WP at 14 (capitalization

altered).)  Plaintiffs also argue that WestPark was intimately involved with the operations and financing of NYIAX throughout the relevant period (*id.*), and WestPark admits that it later rehired R. Ainbinder in 2022-2023 (WP Mem. at 18-19).  After being rehired, R. Ainbinder continued to aggressively solicit Plaintiffs, including "solicit[ing] certain of the Plaintiffs to open new customer accounts at WestPark" (Opp. WP at 14), and even continued to misrepresent NYIAX's IPO as imminent (Compl. ¶ 139).[14]  While the sole fact that WestPark benefitted from R. Ainbinder's conduct is insufficient, the overall circumstances permit an inference that WestPark had at least imputed knowledge of R. Ainbinder's conduct, and that it ratified that conduct when it rehired him and allowed him to continue committing his alleged misdeeds as its registered employee.

The Court therefore declines to dismiss Plaintiffs' Exchange Act claims as to WestPark stemming from the Spivacks' 2020-2022 loans.

### b.    FINRA Unsuitability

Because there is no private right of action based on FINRA's conduct rules, Plaintiffs' unsuitability claims are dismissed as to WestPark.  *See supra* Section III.B.1.c.

### 2.    Common-Law Fraud

As explained above, Plaintiffs have adequately stated common-law fraud claims against R. Ainbinder for the entire period alleged in the Complaint.  *See supra* Section III.B.2.a.

---

[14] Plaintiffs allege that this misrepresentation was made to Steven Spivack and Mr. Held on January 31, 2023.  (Compl. ¶ 139.)  According to documents submitted by WestPark along with its memorandum of law, R. Ainbinder was registered with WestPark at least through January 2023.  (WP Mem. at 18-19.)  It is not clear as a matter of law that R. Ainbinder was not employed at Westpark when he made the January 31 statements.

Because they have plausibly pleaded the existence of a continuing fraud,[15] and that they could not have discovered the existence of the fraud until within the statute of limitations, Plaintiffs' common-law fraud claims are timely.[16]

Plaintiffs do not clarify whether they assert their fraud claims directly against WestPark or rely on a theory of *respondeat superior*. In any event, WestPark is plausibly vicariously liable for the Ainbinders' conduct while employed by WestPark, so the Court need not consider for now whether Plaintiffs have adequately alleged the elements of fraud as to WestPark directly. The Ainbinders were employed by WestPark for the majority of the period during which the continuing fraud occurred. It is also plausible that the fraud concerned conduct within the scope of their employment—namely, soliciting private placement investments for which WestPark received commissions. In any event, "[b]ecause the determination of whether a particular act was within the scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury." *Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 351 (E.D.N.Y. 2019) (citation omitted). Plaintiffs have cleared the plausibility hurdle as to their fraud claims, and the Court therefore declines to dismiss them insofar as they are based on the Ainbinders' conduct while registered with WestPark.

For the reasons explained above, *see supra* Section III.C.1.a, WestPark is also plausibly liable for R. Ainbinder's conduct between 2019 and 2022, when he was not a registered

---

[15] The continuing fraud doctrine still applies to toll the statute of limitations for Plaintiffs' claims sounding in *respondeat superior*. *See, e.g.*, *Souza v. Algoo Realty, LLC*, No. 3:19-CV-00863, 2020 WL 5300925, at *9 (D. Conn. Sept. 4, 2020).

[16] The Court need not decide whether Plaintiffs' equitable estoppel or tolling defense applies to WestPark, as there is an independently sufficient basis for denying dismissal on timeliness grounds.

employee.  This is at least because WestPark plausibly ratified his conduct when it accepted the benefits of his alleged fraud and later rehired him.  *Id.*

### 3.    Other Common-Law Torts

#### a.    Negligent Misrepresentation and Breach of Fiduciary Duty

"In applying a statute of limitations, New York courts have consistently held that 'the reality, and the essence of the action and not its mere name' are controlling."  *Graboi v. Kibel*, 432 F. Supp. 572, 576 (S.D.N.Y. 1977) (quoting *Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 264 (1937)).  Determining "the gravamen of the cause of action" is the crux of the analysis.  *Id.* When fiduciary duty claims sound in fraud, the applicable statute of limitations is the statute for fraud.  *See Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 394 (S.D.N.Y. 2010).  That is also true for negligent misrepresentation claims.  *See In re Argo Commc'ns Corp.*, 134 B.R. 776, 795 (Bankr. S.D.N.Y. 1991); *Ambassador Ins. Co. v. Euclid Servs., Inc.*, No. 80-CV-1235, 1984 WL 341, at *4 (S.D.N.Y. May 24, 1984).  Here, Plaintiffs have adequately pleaded fraud, breach of fiduciary duty, and negligent misrepresentation as to R. Ainbinder, and all three "claims are based on facts that, read in a light most favorable to the plaintiff, allege fraudulent conduct."  *In re Argo*, 134 B.R. at 795.  The limitations period is therefore six years for all three claims, and the discovery rule applies.  It follows that, for the same reasons that Plaintiffs' fraud claims are timely, *see supra* Section III.B.2.b, their breach of fiduciary duty and negligent misrepresentation claims are as well.

As with Plaintiffs' fraud claims, the doctrine of *respondeat superior* applies to these tort claims.  The claims are therefore not dismissed insofar as they arise during the period of the Ainbinders' employment.  WestPark also plausibly ratified R. Ainbinder's conduct between 2019 and 2022, as it benefitted from the conduct, rehired him, and continued to allow him to

commit further alleged misdeeds.  The Court therefore declines to dismiss Plaintiffs' breach of fiduciary duty and negligent misrepresentation claims as to WestPark.

### b.  Negligence

For the reasons as noted above, *see supra* Section III.B.3.c, Plaintiffs fail to state a claim for ordinary negligence based on violations of FINRA's rules of conduct.  Because Plaintiffs do not identify any bases for such claims other than violation of FINRA's suitability rules, their ordinary negligence claims are dismissed as to WestPark.

### c.  Failure to Supervise / Failure to Implement a Reasonable Compliance Program

Plaintiffs next assert claims against WestPark for failure to supervise and failure to implement a reasonable compliance program.  While Plaintiffs allege that this claim is "grounded in negligence," the sources of the duties they identify are the "Rules of the National Association of Securities Dealers ('NASD')" as "adopted by FINRA" (Compl. ¶ 190), "FINRA's taping rule" (*id.* ¶ 192), and a duty, presumably stemming from FINRA's rules, "to ensure that its employees were not making unsuitable investment recommendations . . . or providing false information . . . ." (*id*. ¶ 193).  But, as explained above, there is no private right of action to enforce these industry rules and regulations.  *See Valelly*, 464 F. Supp. 3d at 645.  And Plaintiffs cannot circumvent this lack of a private right of action by relabeling their claims as common-law torts.  *Id.*  Plaintiffs' claims for failure to supervise and failure to implement a compliance program are therefore dismissed.

### d.  Negligent Hiring and Retention

Plaintiffs assert claims against WestPark for negligent hiring and retention.  To state such a claim under New York law, "a Plaintiff must first demonstrate that an employee was negligent.  After satisfying the negligence threshold, a plaintiff must allege (1) that the tort-feasor and the

defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committe[d] on the employer's premises or with the employer's chattel." *Mena v. City of New York*, No. 15-CV-3707, 2019 WL 1900334, at *5 (S.D.N.Y. Apr. 29, 2019) (footnote and quotation marks omitted).

As with Plaintiffs' negligent misrepresentation and breach of fiduciary duty claims, their negligent hiring claim sounds in fraud—the core of the allegation is that WestPark, knowing R. Ainbinder's history of fraudulent misconduct, hired him, and that he then committed fraud on Plaintiffs. The relevant statute of limitations is therefore six years, and the discovery rule applies. Plaintiffs' negligent hiring and retention claims are therefore timely.

Substantively, Plaintiffs have adequately pleaded that R. Ainbinder is liable for fraud, negligent misrepresentation, and breach of fiduciary duty.[17] *See supra* Section III.B.2-3. They have also alleged that WestPark knew or should have known about R. Ainbinder's propensity for this kind of misconduct based on his lengthy history of disciplinary violations. (Compl. ¶¶ 198-201.) And R. Ainbinder's alleged misconduct occurred while he was employed by WestPark and was utilizing WestPark's resources. While a negligent hiring claim requires that the negligent party have "act[ed] outside the scope of her employment," *Newton v. City of New York*, 681 F. Supp. 2d 473, 488 (S.D.N.Y.2010), the question of whether R. Ainbinder's actions were within or outside the scope of his employment is a factual issue best resolved later in these proceedings. Because it is currently unclear as a matter of law which of R. Ainbinder's actions are susceptible to a *respondeat superior* theory of liability and which are susceptible to a negligent hiring theory,

---

[17] The fact that the Court is dismissing Plaintiffs' "negligence" claim based on R. Ainbinder's violation of FINRA's rules does not mean that R. Ainbinder committed no other forms of negligence.

the Court does not see a justification for dismissing the latter claims at this time. Finally, while some of R. Ainbinder's conduct occurred while he was not a formal employee, "the lack of an employer-employee relationship" alone is insufficient to defeat a claim for negligent hiring. *Capak v. St. Execs Mgmt.*, No. 20-CV-11079, 2021 WL 2666007, at *4 (S.D.N.Y. June 29, 2021). The facts that WestPark continued to benefit from R. Ainbinder's conduct between 2019 and 2022, that it rehired him after this period, and that it plausibly ratified his conduct in the interim together allow the Court to draw the reasonable inference that R. Ainbinder shared a sufficient relationship with WestPark during that period to lead to the latter's liability. The Court therefore declines to dismiss Plaintiffs' negligent hiring and retention claims as to WestPark.

### 4. Contract Claims

Like R. Ainbinder, WestPark asserts that there is no contract between Plaintiffs and WestPark. (WP Mem. at 23-24.) In their opposition briefing, Plaintiffs state that "each Plaintiff had a contract with WestPark to maintain customer securities accounts at WestPark," and that under these agreements "WestPark was obligated to supervise Plaintiffs' customer accounts and the recommendations made to customers by WestPark's registered representatives." (Opp. WP at 18.) Plaintiffs also argue that R. Ainbinder's signature block on the NYIAX contracts identified him as an employee of WestPark and identified WestPark as the "Placement Agent." (Opp. WP at 18-19.)

These theories are different from the ones raised in the Complaint, which alleges only the existence of subscription agreements and shareholder agreements between Plaintiffs and NYIAX, and mentions nothing about R. Ainbinder's signature. (*See* Compl. ¶¶ 180-82.) In addition, the one agreement appended to the Complaint belies Plaintiffs' later-alleged signature-block argument. (*See* ECF No. 1-5 at 13 (showing only a signature line for NYIAX).) Whatever the truth of Plaintiffs' new allegations in their opposition papers, the Court may not consider

them. *Williams v. U.S. Info. Sys., Inc.*, No. 11-CV-7471, 2013 WL 214318, at *4 n.4 (S.D.N.Y. Jan. 17, 2013). Only those breach of contract arguments in the Complaint are relevant. Plaintiffs' breach of contract claims are therefore dismissed as to WestPark. And, because there can be no implied duty of good faith and fair dealing in the absence of a valid contract, *Hadami,* 272 F. Supp. 3d at 598, those claims are dismissed as well.

### D. Punitive Damages

Finally, Defendants move to dismiss Plaintiffs' request for punitive damages. Under New York law, "punitive damages are not available in the ordinary fraud and deceit case, but they may be available in fraud actions where the fraud is gross and involves high moral culpability." *Shanahan v. Vallat*, No. 03-CV-3496, 2004 WL 2937805, at *11 (S.D.N.Y. Dec. 19, 2004) (internal quotation marks and citation omitted). Defendants argue that punitive damages are unavailable because the alleged fraud was not "continuous, systematic, or aimed at the public." (WP Mem. at 29.) Setting aside the fact that Plaintiffs have plausibly pleaded a continuous fraud spanning the better part of a decade, the Court is hesitant to categorically rule out the possibility of punitive damages at this early stage in the case. *See China Tr. Bank of New York v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 290 (S.D.N.Y. 1997) ("The Court takes no position as to whether punitive damages are warranted in this case, [as] that is a matter to be decided after all evidence has been admitted at trial.") Defendants' motions to dismiss Plaintiffs' punitive damages claim are denied.

## IV. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED in part and DENIED in part.

The motions to dismiss are granted in their entirety as to claims asserted by Vincent Ruta.

R. Ainbinder's motion is granted as to Plaintiffs' Exchange Act claims based on conduct other than the Spivacks' 2020-2022 loans, Advisors Act claims, FINRA unsuitability claims, negligence claims based on FINRA's suitability rules, contract claims, and implied duty of good faith and fair dealing claims.  The motion is otherwise denied.

WestPark's motion is granted as to Plaintiffs' Exchange Act claims based on conduct other than the Spivacks' 2020-2022 loans, FINRA unsuitability claims, negligence claims based on FINRA's suitability rules, failure to supervise and failure to implement a reasonable compliance program claims, contract claims, and implied duty of good faith and fair dealing claims.  The motion is otherwise denied.

The motions to dismiss Plaintiffs' claims for punitive damages are denied.

Defendants R. Ainbinder and WestPark shall file answers to the remaining claims within 14 days after the date of this opinion and order.

The Clerk of Court is directed to close the motions at Docket Numbers 42 and 55.

SO ORDERED.

Dated: September 30, 2024
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

51